PORTAGE COUNTY BOARD OF COMMISSIONERS ET AL., APPELLEES AND
CROSS-APPELLANTS, ET AL., *v.* CITY OF AKRON, APPELLANT AND
CROSS-APPELLEE; CITY OF RAVENNA, APPELLEE.

[Cite as *Portage Cty. Bd. of Commrs. v. Akron,*
109 Ohio St.3d 106, 2006-Ohio-954.]

(No. 2004–0783—Submitted March 9, 2005—Decided March 6, 2006.)

O'DONNELL, J.

{¶ 1} In this appeal, we are called upon to clarify the nature and extent of the rights to use the Cuyahoga River acquired by the city of Akron in 1911 from an act of the Ohio General Assembly and a deed signed by then Governor Judson Harmon, to determine the effect of Akron's subsequent property acquisitions, and to specify what duty, if any, Akron owes to downstream riparian owners. The history surrounding the 1911 statutory enactment aids understanding of the reasons for the act.

I. Factual History

A. The 1909 Fire

{¶ 2} In 1909, a devastating fire burned out a substantial portion of Akron's downtown business district, causing extensive damage and destroying at least a dozen local business establishments. Lack of an adequate supply of water contributed to the extent of the loss. Also, at about the same time, the State Board of Health determined Akron's water to be unsafe.

{¶ 3} As a result of these conditions, Akron hired two engineers, Frank Barbour of Boston and E.G. Bradbury of Columbus, who examined Akron's water situation and recommended the development of a new source of water for Akron. In accordance with their recommendation, Akron decided to build a water reservoir, and the city fathers approached the Ohio General Assembly for assistance in securing a suitable location.

## B. Legislative Action

{¶ 4} As a result of those efforts, in May 1911, the General Assembly enacted 1911 H.B. No. 357, 102 Ohio Laws 175, which provided:

{¶ 5} "[T]here is hereby granted to the city of Akron, in the county of Summit, and state of Ohio, the right to divert and use forever for the purpose of supplying water to said city of Akron and the inhabitants thereof, the Tuscarawas river, the big Cuyahoga and little Cuyahoga rivers, and the tributaries thereto, now wholly or partly owned or controlled by the state and used for the purpose of supplying water to the northern division of the Ohio canal, provided, however, and this grant is upon the condition that at no time shall said city use the waters of any such stream, to such extent or in such manner as to diminish or lessen the supply now necessary, to maintain the flow in and through the canal as said canal now exists or as hereafter may become necessary for navigation purposes for an enlarged canal and upon the further condition that the city of Akron shall at all times save the state harmless from all claims arising from such grant and construction thereunder.

{¶ 6} "Section 2. There is hereby granted to said city of Akron for the waterworks purposes as aforesaid the right to enter in and upon and occupy the lands of the state in said Summit county to develop additional storage either by the construction of new reservoirs or dams, or the enlargement of those already constructed by the state on said rivers, always provided that said construction or enlargement will not result in any interference with or diminution of the supply now necessary for said canal for navigation purposes. And, provided further, that before any such construction of reservoirs or dams, or enlargement of reservoirs or dams now existing shall be commenced, the plans and specifications therefor be first approved by the chief engineer of the state board of public works. And further provided, that any diversion or impounding on the lands of the state of said Tuscarawas river and the tributaries thereto, by said city of Akron, shall be east of highway known as South Main street extended south. And if the waters of said Tuscarawas river are impounded, used or diverted by said city, the amount of the flow as now or hereafter used and controlled by the state shall not be diminished by such impounding, use or diversion by said city during the months of June, July, August, September, October and November; and at no time shall said city of Akron take or use from any reservoir constructed on the Tuscarawas river an amount of water in excess of an annual average of fifteen million gallons per day * * *."

## C. Deed from Governor Harmon

{¶ 7} Following enactment of that legislation, on October 13, 1911, Governor Judson Harmon executed a deed in favor of the city of Akron, which provided:

{¶ 8} "I * * * do hereby grant to the city of Akron, Summit County, Ohio, the right to divert and use forever, for the purpose of supplying water to said city of Akron, and the inhabitants thereof, and for no other purpose, the waters of the Tuscarawas River, the Big Cuyahoga River and Little Cuyahoga River, and the tributaries thereto, now wholly or partly owned and controlled by the state of Ohio, and used for the purpose of supplying water to the northern division of the Ohio Canal * * *."

### D. Akron's 1912 Ordinance and Lake Rockwell

{¶ 9} A regional map of the Cuyahoga River (Appendix A) shows its source in Northeast Geauga County, Ohio, from where it flows in a generally southwesterly direction into Portage County, toward and through the city of Kent, and then crosses the eastern border of Summit County, where it flows past the village of Silver Lake and the cities of Munroe Falls and Cuyahoga Falls and then flows northward through Cuyahoga County and empties into Lake Erie. The portion of the river from Lake Rockwell through Cuyahoga Falls is known as the middle Cuyahoga.

{¶ 10} Barbour and Bradbury considered several sites for Akron's reservoir, but ultimately recommended a location on the Cuyahoga River in Portage County, now known as Lake Rockwell.

{¶ 11} After receiving the deed from Governor Harmon, Akron enacted an ordinance in 1912 for acquisition of water upstream from the proposed site of Lake Rockwell. The 1912 Akron ordinance appropriated "[a]ll the waters of the Cuyahoga River" above the proposed site for Lake Rockwell Dam and also "all the waters of all the tributaries of said Cuyahoga River above the [proposed Lake Rockwell site] and all the waters which may flow into and from said Cuyahoga River and the tributaries thereof above [the proposed Lake Rockwell site]." On the express authority of that ordinance, Akron's solicitor negotiated settlements with some owners affected by Akron's appropriation and began court proceedings to compensate other riparians.

{¶ 12} One riparian owner, W.S. Kent, settled with Akron and executed a quitclaim deed for the riparian rights to his property in exchange for $75,000. That deed provided that W.S. Kent agreed to "remise, release and forever quit claim unto said City [of Akron], all his water rights in the Cuyahoga River or connected with the property hereinbefore described, which are, or may be taken or interfered with or destroyed by said proposed taking, diversion, and permanent appropriation by the said city of waters of the Cuyahoga River for City of Akron Water Works Purposes, and no other purposes * * *. Expressly reserving to said W.S. Kent, his heirs and assigns, the right to use and enjoy forever as heretofore all the waters of the Cuyahoga River not appropriated or made use of

by said City of Akron for its water works purposes * * *." After deeding those riparian rights to Akron, W.S. Kent transferred title to the associated land to others, and some of it was eventually purchased by the city of Kent.

{¶ 13} As Akron continued to acquire water rights, the village of Cuyahoga Falls filed suit to enjoin Akron from taking water from the Cuyahoga River above the city of Kent, alleging that the taking would lessen the flow in the river and diminish Cuyahoga Falls' future water supply. Although the record of that case was destroyed, a reconstructed file reflects that on May 5, 1915, Judge D.A. Doyle entered judgment in favor of Akron and denied the request of Cuyahoga Falls for an injunction.

{¶ 14} Through continued negotiations and purchases, Akron obtained a large tract of land in Portage County, upon which it dammed the Cuyahoga River and created Lake Rockwell. Akron began distributing water from Lake Rockwell in 1915, and its waterworks system grew with the additions of the East Branch Reservoir in 1939 and the LaDue Reservoir in 1962. However, Akron's population and industrial base have declined since the 1960s, and thus, to offset losses occasioned by that decline, Akron attempted to increase its waterworks-customer base and resulting revenue by annexing surrounding communities.

### E. Annexation and the Joint Economic–Development Districts

{¶ 15} Sometime during the 1970s and 1980s, Akron annexed land within the townships of Bath, Copley, Coventry, and Springfield, in exchange for its commitment to provide them with water. Akron encountered increasing animosity from surrounding communities because of its annexation policies and, as a result, formulated joint economic-development districts, commonly known as JEDDs, which are formed by a municipality and township cooperating to accomplish objectives that neither could achieve independently—with Akron providing water and the townships compensating Akron. This concept led to enactment of R.C. 715.70, which provides:

{¶ 16} "(B)(1) One or more municipal corporations and one or more townships may enter into a contract approved by the legislative authority of each contracting party pursuant to which they create as a joint economic development district an area or areas for the purpose of facilitating economic development to create or preserve jobs and employment opportunities and to improve the economic welfare of the people in the state and in the area of the contracting parties."

{¶ 17} As an incentive to participate in a JEDD, Akron agreed to detach any areas of townships that it had annexed. Residents in the townships of Copley, Springfield, Coventry, and Bath approved the JEDDs. According to one projection, Akron will eventually sell an aggregate 4.8 millions of gallons per day ("MGD") of water to those communities.

{¶ 18} After establishing the JEDDs, Akron negotiated a lease with the Ohio Department of Natural Resources ("ODNR") because of concerns that its supply of water to the JEDDs would constitute an interbasin water use regulated by R.C. 1501.32. The lease specified that Akron would lease 3.0 MGD of water from the ODNR in exchange for its agreement to compensate the state and to release 3.5 MGD from Lake Rockwell except in specified drought conditions. In addition, ODNR determined that Akron did not need a permit under R.C. 1501.32 because the provision of water to the JEDDs did not constitute a diversion regulated by that statute, in view of Akron's compensating release of water into the Cuyahoga. Since the inception of its lease with ODNR, however, Akron has voluntarily released 5.0 MGD from Lake Rockwell.[1]

## II. Procedural History

{¶ 19} For many years after Lake Rockwell's completion, the flow of water in the Cuyahoga River met the needs of the downstream riparians, enabling them to use the river in the same fashion as they had before Akron built the dam.

{¶ 20} In 1998, however, anticipating water-quality problems with the Cuyahoga River following Akron's water lease with the ODNR and creation of four JEDDs, the Portage County Board of Commissioners, together with the cities of Kent, Cuyahoga Falls, and Munroe Falls and the village of Silver Lake, filed suit against Akron alleging unreasonable use of water, denial of public access to Lake Rockwell, creation of a public and private nuisance, negligence, and violation of R.C. 1501.32, seeking declaratory judgments, injunctions, and damages.[2]

{¶ 21} Akron answered, asserted 24 defenses, and counterclaimed against the affected communities, alleging, inter alia, conversion of and trespass on water. Akron also filed a third-party complaint against the city of Ravenna, alleging that it infringed Akron's rights under the 1911 statute by maintaining a dam on a tributary of Breakneck Creek, a tributary of the Cuyahoga, which decreased the flow of water, affecting the downstream communities. See Appendix A. Ravenna then answered and counterclaimed with allegations similar to those made by the affected communities.

{¶ 22} Three of four JEDDs, Copley–Akron, Springfield–Akron, and Coventry–Akron, intervened in the case with the consent of all parties and counterclaimed

---

1. Akron released less than 5.0 MGD on 19 days between the filing of this lawsuit and the trial.

2. The cities of Kent, Cuyahoga Falls, and Munroe Falls and the village of Silver Lake are municipalities located downstream from Lake Rockwell on the middle Cuyahoga River. These downstream municipalities and Portage County will be collectively referred to as the affected communities unless otherwise indicated.

against the affected communities, seeking a declaratory judgment that Akron had lawfully entered into the JEDD agreements pursuant to R.C. 715.70.

{¶ 23} The trial court, after granting dispositive motions on several claims, conducted a 16-day bench trial on the remaining claims.

## A.  Trial Court Rulings on Dispositive Motions

{¶ 24} The trial court initially determined that in Ohio, riparian rights belong to the abutting landowners along a riverbank.  It then granted summary judgment in favor of the affected communities and Ravenna, holding that the 1911 statute granted Akron a limited use of the Cuyahoga River and its tributaries and further holding that the state could convey to Akron only the riparian rights that it owned at the time of conveyance.  The trial court found that the river is owned by the riparian owners in each parcel of land that the river flows through in Portage, Geauga, and Summit Counties, and it ruled that Akron did not obtain riparian rights to the use of the Cuyahoga River or any tributaries from the 1911 enactment or the deed from Governor Harmon.

{¶ 25} The trial court also granted summary judgment in favor of the affected communities on Akron's counterclaim for trespass on and conversion of water, and it dismissed the affected communities' claim that Akron violated R.C. 1501.32, requiring an ODNR permit for interbasin diversion of water.

## B.  Trial

{¶ 26} Following those dispositive rulings, a 16-day bench trial began and focused on whether the affected communities themselves owned any riparian rights, thereby providing them standing, and whether their claims of unreasonable use and nuisance had merit.

{¶ 27} The court heard testimony from Paul Murrow and Douglas Marshall, title-examination expert witnesses, who testified on behalf of Munroe Falls, Silver Lake, and Cuyahoga Falls, and found that each municipality held title to land abutting the Cuyahoga River together with the associated riparian rights.  The city of Kent presented Constance Highman, an expert witness on title examination, who testified that Kent had received a number of its riverfront properties indirectly from W.S. Kent but that it also owned property on the Cuyahoga River next to Standing Rock Cemetery and, as a result, also owned the riparian rights associated with that property.  Portage County failed to present any testimony regarding its ownership of any riparian rights to the Cuyahoga River.

{¶ 28} The trial court concluded that Munroe Falls, Silver Lake, and Cuyahoga Falls owned riparian rights and therefore had sufficient standing to contest Akron's use and alleged nuisance.  It found, however, that Portage County did

not own any riparian property and therefore lacked standing to present an unreasonable-use claim.

{¶ 29} With respect to the city of Kent, the trial court found that it owned the property next to Standing Rock Cemetery and its attendant riparian rights without limitation but that Kent had obtained its remaining riverfront property, once owned by W.S. Kent, only after he had quitclaimed the riparian rights to Akron. Because W.S. Kent lacked the ability to sever riparian rights from the property, according to the trial court, Akron received only a servitude for riparian uses, which remained effective against future owners.[3] The court held, however, that the release of rights by W.S. Kent was personal to him and did not bind the future landowners, i.e., the city of Kent. This led the court to conclude that Kent had standing to challenge Akron's use of the river.

{¶ 30} Regarding the reasonableness of Akron's use of the river, David Crandell, Akron's Public Utilities Manager, testified in January 2001 that the city had released 5.0 MGD from Lake Rockwell since 1998, except for 19 days. Akron then presented Dr. Dominique Brocard, an environmental engineer hydrologist, who stated that 3.1 to 4.5 MGD flows from Lake Rockwell from lagoon overflow at Akron's adjacent water-treatment plant, seepage from the bottom of Lake Rockwell and the dikes containing Lake Rockwell, and leakage from the flashboards added to increase retention during the summer.

{¶ 31} The affected communities' expert, James Teitt, an aquatic ecologist and fisheries biologist, testified that the middle Cuyahoga River would meet water-quality standards for dissolved oxygen if Akron released 8.5 MGD from Lake Rockwell, but that 10.9 MGD was necessary to support the health of the habitat.

{¶ 32} After finding that "if Akron continues to release at least 5.0 MGD of good quality water, then Akron's taking of water from the middle Cuyahoga River is not unreasonable," the trial court entered judgment for Akron but declined to issue an injunction on the unreasonable-use claim filed by Kent, Munroe Falls, Silver Lake, and Cuyahoga Falls.

{¶ 33} The trial court also determined that an aggregate 8.1 to 9.5 MGD of water flowed out of Lake Rockwell each day, a figure it calculated by combining Akron's voluntary 5.0 MGD release from the dam and the 3.1 to 4.5 MGD of water from other sources. Based on this aggregate flow, the trial court also determined that Akron's operation of Lake Rockwell did not constitute a public

---

3. Although the court of appeals analyzed whether riparian rights could be severed from the abutting land and the effect of severance upon subsequent owners of abutting land, that issue is not before us. 156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 75–93. While Kent originally raised this issue as a proposition of law on cross-appeal, it declined to brief the issue once we accepted the case for discretionary review.

or private nuisance, and it declined to issue a declaratory judgment regarding Akron's duty in this regard.

{¶ 34} In its judgment, the trial court rejected several defenses asserted by Akron that allegedly barred the affected communities' suit. The trial court determined that Akron's defense of the statute of limitations was not well taken, because it held that a new cause of action for nuisance or unreasonable use of water could accrue on continued misuse of water; that Akron's defenses of adverse possession and laches failed because neither defense operates against a governmental entity; and that res judicata did not bar the current suit, because the issues presented in this litigation could not have been raised in the 1913 Cuyahoga Falls lawsuit.[4]

{¶ 35} Regarding Portage County's claim of the public's right of access to Lake Rockwell, the trial court ordered Akron to permit nonmotorized recreational boating on the lake because the river has the capacity for recreational boating, and Akron lacked a reasonable basis for excluding the public.

{¶ 36} Both Akron and the affected communities appealed the trial court judgment to the Eleventh District Court of Appeals, focusing on the rights conveyed in the 1911 statute and the amount of water to be released from Lake Rockwell.

## C. Court of Appeals Decision

{¶ 37} The court of appeals affirmed the judgment of the trial court that the plain language of the 1911 statute and the deed from Governor Harmon conveyed only the right to water previously owned or controlled by the state and used to supply the Ohio Canal. Since Akron failed to establish that the state owned any riparian rights in the middle Cuyahoga River or any of its tributaries, the appellate court affirmed that "the 1911 statute and the governor's deed did not grant [Akron] any riparian water rights in the portion of the Cuyahoga River that flows through Portage County." 156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 41. The appellate court further held that Akron's sale of water went beyond the rights it received pursuant to the 1911 statute; however, it noted that the issue was moot in view of the riparian rights Akron secured when it acquired land along the banks of the Cuyahoga River in Portage County. Id. at ¶ 69–71.

{¶ 38} Regarding Akron's use of water, the court of appeals agreed that Akron had not unreasonably used the water or created a nuisance, id. at ¶ 137–143, that

---

4. The trial court also rejected the following defenses, which are not at issue in this appeal: sovereign immunity, accord and satisfaction, the equitable defense of unclean hands, and failure to exhaust administrative remedies.

Akron had voluntarily and intentionally released 5.0 MGD, and that 3.1 to 4.5 MGD bypassed the dam, id. at ¶ 197–202. The appellate court, however, remanded that matter to the trial court to issue a judgment declaring the amount of water that Akron must release from Lake Rockwell. Id. at ¶ 214 and 222.

{¶ 39} Regarding standing, the appellate court held that Munroe Falls, Silver Lake, and Cuyahoga Falls had standing before the trial court but that because the quitclaim deed from W.S. Kent granted Akron unlimited riparian rights, the city of Kent did not. 156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 89–92, 110–113.

{¶ 40} Regarding the remaining issues concerning Akron's claim of trespass at the Shalersville well field, the water-diversion permit from ODNR, and public access to Lake Rockwell, the appellate court held that because Portage County owned the Shalersville well field, Akron had no cause of action, that the affected communities' failure to join ODNR as a party deprived the court of jurisdiction, and that Akron could prohibit public access to Lake Rockwell. Id. at ¶ 133, 218, and 181.

### III. Issues on Appeal

{¶ 41} Both Akron and the affected communities have again appealed separate rulings of the court of appeals on these issues;[5] we granted discretionary review and will first consider the effect of the 1911 statute.[6] 103 Ohio St.3d 1442, 2004-Ohio-4626, 814 N.E.2d 869.

{¶ 42} At the outset, we recognize that our task here is to consider only the legal principles involved and resolve them in accordance with law; the overarching questions regarding water usage are obviously best handled by cooperative regional planning in conjunction with the appropriate federal, state, and local administrative agencies.

{¶ 43} Two main areas of concern permeate the briefs and arguments of counsel: first, a clarification of the law with respect to use of the water in the Cuyahoga River pursuant to the 1911 statute and other acquired rights and, second, a declaration with respect to what obligation, if any, Akron owes to downstream riparians to release water from Lake Rockwell.

### A. Akron's Water Rights

{¶ 44} Akron argues that it owns an unlimited and unconditional right to all the water within the Cuyahoga River and its tributaries, including Breakneck Creek,

---

5. The propositions of law are set forth in Appendix B to this opinion.

6. Ravenna participated in this appeal by way of response to Akron's first, second, and seventh propositions of law, regarding Akron's rights to the Cuyahoga River and Breakneck Creek under the 1911 statute.

by virtue of the grant it received from the 1911 statute and the deed signed by Governor Harmon.

{¶ 45} Akron alleges that the appellate court misconstrued the 1911 statute in a way that frustrates the intent of the General Assembly, failed to examine the statute as a whole, and ignored several key indicators of the proper construction of the statute.

{¶ 46} First, Akron maintains that the General Assembly differentiated between an unlimited grant of water rights and a separate, limited grant of land rights in the 1911 statute. Specifically Akron points to the difference between the statute's broad grant of water rights in section one and the separate grant of limited land rights in section two, which requires Akron to compensate the state for using state land "exclusive of water." According to Akron, while section two of the statute in effect gave it an option to purchase land owned by the state, section three of the statute ordered the Governor to immediately deliver to Akron "a grant of the right to use forever the waters of such streams." Akron claims that this distinction between the granted water and land rights illustrates the state's intent to convey a very broad right to use the water any way Akron saw fit.

{¶ 47} Second, Akron claims that the broad language "the right to divert * * * the big Cuyahoga * * * and the tributaries thereto" in the 1911 statute conveyed to Akron not only the rights owned by the state but also the state's inchoate ability to seize the river and its tributaries for public purposes. Any other reading, Akron argues, renders meaningless the inclusion of the river's tributaries in the grant because the state had not previously appropriated the water of any tributary.

{¶ 48} Third, Akron argues that since the 1911 statute states, "[T]his grant is upon the condition that at no time shall [Akron] use the waters * * * in such manner as to diminish or lessen the supply now necessary, to maintain the flow in and through the canal," it authorized Akron to take all water not used by the state for the operation of its canal, further indicating the General Assembly's broad intent to grant Akron rights with respect to all unowned and unused tributaries.

{¶ 49} As one of its arguments regarding proper statutory construction of the 1911 statute, Akron argues that the General Assembly's disparate treatment of the Cuyahoga and Tuscarawas Rivers evinces its intent to give Akron an unlimited right to the Cuyahoga River. Section two of the statute restricts Akron's diversion of the Tuscarawas River by location, quantity, and season, while no similar restrictions apply to the Cuyahoga. Akron claims that the lack of restrictions means that it received a limitless right to the water of the Cuyahoga.

{¶ 50} In response, the affected communities and Ravenna contend that the 1911 statute and the deed signed by Governor Harmon did not convey all the water in the Cuyahoga River or its tributaries to Akron. Rather, they assert that Akron received only the right to use the water that the state had been using in connection with the Ohio Canal because of deed language limiting the rights granted to Akron to "the right to * * * use forever * * * the waters of the * * * Cuyahoga River * * * and the tributaries thereto, now wholly or partly owned and controlled by the state of Ohio, and used for the purpose of supplying water to the northern division of the Ohio Canal." Further evidence of a limited grant, the affected communities and Ravenna claim, is the fact that the state limited the deed to the rights needed "for the purpose of supplying water to said city of Akron, and the inhabitants thereof, and for no other purpose." If the state made an unlimited grant, the affected communities and Ravenna maintain, the phrase "for no other purpose" would be contradictory. The plain language, they submit, precludes Akron from supplying water to nonresidents unless it uses its common-law riparian rights at Lake Rockwell without unreasonably harming the rights of downstream riparians. Finally, they argue that in conveying water rights to the tributaries of the rivers, the state could convey to Akron only the rights the state had at the time of the grant, which were limited to consuming only a reasonable amount of water from the river and its tributaries and releasing the remaining flow for downstream riparians.

{¶ 51} The issue for resolution by this court, then, concerns the nature of the grant Akron received from the General Assembly and Akron's right to use the water of the Cuyahoga River and its tributaries.

{¶ 52} Following a primary rule of statutory construction, we must apply a statute as it is written when its meaning is unambiguous and definite. *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.* (1996), 74 Ohio St.3d 543, 545, 660 N.E.2d 463. An unambiguous statute must be applied in a manner consistent with the plain meaning of the statutory language, and a court cannot simply ignore or add words. *State ex rel. Burrows v. Indus. Comm.* (1997), 78 Ohio St.3d 78, 81, 676 N.E.2d 519. See, also, *Morgan v. Ohio Adult Parole Auth.* (1994), 68 Ohio St.3d 344, 347, 626 N.E.2d 939. The purpose of statutory construction is to discern the actual meaning of the statute. *First Natl. Bank of Wilmington v. Kosydar* (1976), 45 Ohio St.2d 101, 106, 74 O.O.2d 206, 341 N.E.2d 579.

{¶ 53} Our court first addressed the issue of riparian rights in *Gavit's Admrs. v. Chambers* (1828), 3 Ohio 495, in which we held that the federal government did not retain ownership of the rivers in the former Northwest territories and that Ohio followed the common-law rule that ownership of a riverbed lies with the owner of the land abutting the river.

{¶ 54} Nineteen years later, in *Walker v. Bd. of Public Works* (1847), 16 Ohio 540, we applied the logic of *Gavit's Admrs.* to interests in the water itself. *Walker* answered several fundamental questions about the nature of private and public riparian rights to flowing water. First, rights to use the water derive from ownership of property abutting the river: "The proprietor of the lands upon its banks may use the waters, of the river in any way not inconsistent with the public easement [of navigation], or of private rights * * *." Id. at 544. Second, right to the water is a right of use, not possession: "The right of the adjacent proprietor to the water of the stream is a usufructory [sic] right, appurtenant to the freehold, not an absolute property." Id. Third, the holder of a riparian right is protected against injury from others' use of the water: "neither the state nor any individual has the right to divert the water to his injury." Id. Finally, the state may appropriate riparian interests only through eminent domain. "[T]he state, in its exercise of the right of eminent domain, can subject the waters of such stream to other public uses the same as any other private property, by making a just compensation for the injury, and not otherwise." Id.

{¶ 55} In *Walker*, the court did not confront an issue involving competing riparians. A pair of cases involving adjacent riparians, though, does give some content to the duty of one riparian to another. In *Cooper v. Hall* (1832), 5 Ohio 320, 323, we declared that the act of one riparian must cause "material, substantial" injury to "subject him to an action." We followed this principle in *McElroy v. Goble* (1856), 6 Ohio St. 187, 188–189, noting that "no action can be sustained [against an upstream riparian] for any such use of the water whereby the quantity is diminished in the stream, or the water caused to flow more irregularly * * * unless the damage occasioned be *real, material, and substantial,* arising from an unreasonable or improper use." (Emphasis sic.)

{¶ 56} By 1881, this court concluded that the rule of *Gavit's Admrs.* constituted a settled principle of property law in Ohio. *June v. Purcell* (1881), 36 Ohio St. 396. At the turn of the century, we emphasized that riparian rights, as property, enjoy the same constitutional protection as rights in land. *Mansfield v. Balliett* (1902), 65 Ohio St. 451, 63 N.E. 86, paragraph one of the syllabus. In reaching that holding, the court again explained that riparian rights arise from ownership of land abutting a river. Id. at 466, 63 N.E. 86. The *Balliett* court also noted the general rule that riparian rights may be sold separately from the land that spawns them. "There appears to be no diversity of opinion upon the proposition that riparian rights are property that may be the subject of bargain and sale, either with or separate from the land * * *." Id. at 470, 63 N.E. 86.

{¶ 57} That same year, we considered whether a municipality may exercise its riparian rights for the benefit of nonriparian landowners. That is, may a municipality, because it owns land along a river, withdraw that water for the use

of its citizens who do not own land abutting the river? In *Canton v. Shock* (1902), 66 Ohio St. 19, 63 N.E. 600, paragraph three of the syllabus, we answered in the affirmative. *Shock* also addressed the duty of reasonable use that an upper riparian owes to a lower riparian by tying the reasonableness to an actual injury to the lower riparian: "The real and only question upon which a liability could be founded [is] whether the flow of the water in the stream was materially diminished, to the injury of the lower proprietors * * *." Id. at 34, 63 N.E. 600.

{¶ 58} In order to analyze Akron's rights, we look first to the plain language of the 1911 statute and deed that conveyed the right to use the water in the Cuyahoga River "now wholly or partly owned or controlled by the state and used for the purpose of supplying water to the * * * Ohio Canal."

{¶ 59} While conveying to Akron the right to use the water of the Cuyahoga River, the 1911 statute limited the right to water that the state partly or wholly owned or controlled and used for supplying water to the Ohio Canal. These words are plain and unambiguous and restrict the grant. Akron received only the right to use the water that the state used to supply water to its canal. Were we to conclude otherwise and adopt Akron's position, those words in the statute would be rendered meaningless, and we would have to ignore the statutory references to ownership or control and use.

{¶ 60} Importantly, the state lacked authority to convey to Akron any water rights to the Cuyahoga River, and its tributaries because those rights belonged to the owners of the land abutting the Cuyahoga River and the record does not contain evidence that the state owned land abutting the Cuyahoga River or its tributaries in 1911. See *Balliett*, 65 Ohio St. 451, 63 N.E. 86; *Gavit's Admrs.*, 3 Ohio 495; *June*, 36 Ohio St. 396; *Walker*, 16 Ohio 540. Stated differently, the General Assembly could not grant to Akron what it did not own. Akron's rights to water in the Cuyahoga River derive from other sources, namely, riparian rights that it owns at Lake Rockwell and in the watershed—ownership that is not contested by the affected communities.

{¶ 61} The affected communities and Ravenna also attack Akron's right to sell water to nonresidents of the city in the JEDDs, urging that the legislative grant restricted its use to the city of Akron and its inhabitants. Although this position correctly states the scope of the 1911 grant from the state, it does not consider the fact that Akron subsequently obtained riparian rights by acquiring land from riparian owners, nor does it consider Akron's lease of water from ODNR. Accordingly, Akron's right to sell water emanates from its status as a riparian owner.

## B. Release from Lake Rockwell

{¶ 62} The appellate court remanded this case to the common pleas court for a "specific declaration concerning the amount of water [Akron] is required to

release from Lake Rockwell into the Cuyahoga River on a daily basis."  156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 222.

{¶ 63} The affected communities ask this court to order Akron to release 10.9 or 8.5 MGD of water, or at least to continue its current release of 5.0 MGD. Entitlement to the 10.9 MGD release is based on the testimony of James Teitt, who discussed the need to preserve aquatic habitats and meet Ohio Environmental Protection Agency ("EPA") water standards.  The affected communities' alternative argument for an 8.5 MGD release is based on the Ohio EPA's determination that a release of 8.5 MGD from Lake Rockwell would bring the Cuyahoga into compliance with standards for dissolved oxygen.

{¶ 64} Akron maintains that release of water from Lake Rockwell involves balancing the changing needs of competing riparian owners and evaluating evolving flow conditions in a dynamic watershed and contends that any specific decision would be only a hypothetical declaration.  Thus, it argues, the appellate court decision to the contrary constituted error.

{¶ 65} Accordingly, we are concerned with the decision of the appellate court and its directive regarding the release of water from Lake Rockwell.

{¶ 66} In 1998, Akron negotiated a 40–year lease with the ODNR in which it agreed to release 3.5 MGD from Lake Rockwell except in specified drought conditions, but it has voluntarily exceeded that obligation and released 5.0 MGD. In addition, the testimony of Dr. Dominique Brocard, an environmental engineer hydrologist, confirmed a flow of 8.1 to 9.5 MGD as the aggregate current flow from Lake Rockwell.

{¶ 67} The trial court found and the appellate court agreed that the flow of water between 8.1 and 9.5 MGD and Akron's current use were reasonable. Because the record supports and corroborates that decision, we affirm it. Further, the appellate court considered the voluntary nature of the release by Akron and expressed its concern that the flow be made permanent, stating that otherwise Akron could decrease either the current 5.0 MGD release or the 3.1 to 4.5 MGD bypass.  This concern prompted the court of appeals to remand the matter to the common pleas court for issuance of a declaratory judgment.  156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 214.

{¶ 68} We recognize that the trial judge ably reviewed voluminous exhibits and, after conducting a 16-day trial, reached a judgment as to the reasonable flow of water in the Cuyahoga River.  And the appellate court authored a scholarly opinion in which it demonstrated concern regarding the water flow by remanding the matter for issuance of a declaratory judgment to ensure the continuation of a reasonable water flow.

{¶ 69} Based on our review of the record, however, we are not persuaded that a declaratory judgment regarding reasonable water flow without a specific quantity would be meaningful. Accordingly, we affirm the judgment of the appellate court, remanding the matter for issuance of declaratory judgment, but we modify that judgment to conform to the evidence contained in the record that Akron must maintain an aggregate of 8.1 to 9.5 MGD, which presently consists of at least 5.0 MGD of good quality water intentionally released from Lake Rockwell and approximately 3.1 to 4.5 MGD flow from other sources. Since Akron's release has been found to be reasonable, we modify the order of the appellate court and direct the trial court to issue a declaratory judgment specifying the quantity of water to be released in conformity with that evidence. Accordingly, the issue of an injunction is moot. Furthermore, the trial court need not conduct any further hearing before issuing the declaratory judgment because sufficient findings have already been made in its determination that the aggregate flow of 8.1 to 9.5 MGD is a reasonable one. Therefore, the judgment of the court of appeals in this regard is modified and, as modified, is affirmed.

{¶ 70} As Chief Justice Moyer stated during the oral argument, this case cries out for regional planning. Clearly the General Assembly, the EPA, ODNR, the parties, and other municipalities and communities have common and opposing interests that this court is not equipped to negotiate, because our role is to adjudicate legal issues in accordance with the facts presented and the applicable law. The judiciary is not designed to coordinate interests in a watershed district or control the natural resources of the state of Ohio. Those matters are more efficiently resolved through regional planning undertaken by the parties and the regulatory bodies of this state, as had been attempted through involvement of the Northeast Ohio Four County Regional Planning Development Organization described at trial by Claude Custer, who testified as a witness for Akron.

## C. Defenses Presented by Akron

{¶ 71} We next examine the defenses presented by Akron and rejected by the trial court in its judgment.

### (i) Statute of Limitations

{¶ 72} Akron asserts that the 85–year delay between its appropriation of water rights and the filing of the complaint bars the current litigation, asserting that landowners in 1912 had only 21 years to seek compensation for lost riparian rights. The affected communities contend that Akron's unreasonable use of water is a continuing tort and can be challenged at any time it causes injury.

{¶ 73} Thus, the issue here concerns the ability of the affected communities to seek redress for Akron's use of water of the Cuyahoga River.

{¶ 74} Because of the nature of flowing water, Ohio distinguishes ownership of land from ownership of riparian rights. In *Walker*, 16 Ohio at 544, we noted, "The right of the adjacent proprietor to the water of the stream is a usufructory [sic] right, appurtenant to the freehold, not an absolute property." A usufruct is "[a] right to use and enjoy the fruits of another's property for a period without damaging or diminishing it, although the property might naturally deteriorate over time." Black's Law Dictionary (8th Ed.2004) 1580.

{¶ 75} In *Pollock v. Cleveland Ship Bldg. Co.* (1897), 56 Ohio St. 655, 666, 47 N.E. 582, we stated: "[I]t is universally conceded that the water of a stream is not the subject of ownership in the ordinary sense. As expressed in *Lancey v. Clifford* [1867], 54 Me. 487: 'The right of property is in the right to use its flow, and not in the specific water.' That is, it is but a usufructuary right, a right to enjoy that which belongs to another, and to draw from it all the advantage it will produce without wasting its substance."

{¶ 76} Because Akron cannot own a specific quantity of water as a riparian owner when there are other riparians downstream, its argument that the affected communities somehow acquiesced in its ownership ignores the nature of the riparian right.

{¶ 77} Furthermore, as noted by the appellate court, a landowner has more than one remedy available to protect a riparian right. 156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 104. See *Longworth v. Cincinnati* (1891), 48 Ohio St. 637, 640, 29 N.E. 274; *Finamore v. Cann* (1975), 43 Ohio App.2d 134, 72 O.O.2d 328, 334 N.E.2d 518, at paragraph one of the syllabus; *Florian v. Paul* (June 8, 1977), 1st Dist. No. C–76332. Thus, while Akron correctly asserts its 21-year statute-of-limitations defense to foreclose appropriation damages if appropriation was possible, downstream riparians may alternatively assert a reasonable-use claim to protect their riparian rights.

### (ii) Adverse Possession

{¶ 78} Akron asserts as another defense a property right to the flow of the Cuyahoga River via adverse possession or adverse use.[7] The affected communities contend that adverse use does not establish or control rights to flowing water, that adverse use cannot create rights to public property, and that Akron failed to prove the elements of its claim for adverse use.

{¶ 79} We believe that the issue of Akron's claim to adverse use can be resolved without resolving the question of municipal claims or defenses to adverse use. To have acquired rights to the use of water adversely, Akron must have used the water in a manner that actually injured the affected communities by

---

7. "Adverse use" here means both adverse possession and adverse use.

depriving them of riparian rights. Without this injury, the time limit for litigating adverse use cannot start. See, e.g., *Kennedy v. Niles Water Supply Co.* (1913), 173 Mich. 474, 139 N.W. 241. Since Akron's use of the Cuyahoga River is reasonable as determined by the trial court and affirmed by the court of appeals and by this court, Akron's use has not injured the affected communities, and therefore, it has never exercised riparian interests adverse to them. Accordingly, Akron's claim to adverse-use riparian rights in the waters of the Cuyahoga is not well taken.

### (iii) Laches

{¶ 80} Akron next contends that the doctrine of laches should prevent the affected communities from maintaining this suit because Akron has asserted its rights since 1912. In response, the affected communities assert that this defense may not be used against a government entity and that Akron failed to prove the elements.

{¶ 81} We have held that the elements of a laches defense are "(1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections* (1995), 74 Ohio St.3d 143, 145, 656 N.E.2d 1277.

{¶ 82} Thus, the party relying on the defense of laches must demonstrate at least constructive knowledge of the injury on the part of the affected party as a starting point of the delay that it asserts. Here, the record does not show that Akron injured the affected communities, because its use was adjudicated reasonable pursuant to the determinations of the trial and appellate courts, which we uphold. Further, laches is generally not available against government entities. *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 146, 555 N.E.2d 630, citing *Ohio Dept. of Transp. v. Sullivan* (1988), 38 Ohio St.3d 137, 139, 527 N.E.2d 798. Therefore, laches did not operate to bar the affected communities' prosecution of this lawsuit.

### (iv) Res Judicata

{¶ 83} Akron urges that res judicata bars the current action because the city of Cuyahoga Falls raised the same issues in its 1913 litigation, in which Akron prevailed. The affected communities claim that it is not a bar to the litigation here because the instant case concerns Akron's current, increased use of the Cuyahoga River.

{¶ 84} This court set forth the standard for res judicata in *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 653 N.E.2d 226, at paragraph one of the syllabus: "[A] valid, final judgment rendered upon the merits bars all subsequent actions

based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava* further noted that 1 Restatement of the Law 2d, Judgments (1982), Comment b to Section 24, defined "transaction" as a "common nucleus of operative facts." Id. at 382, 653 N.E.2d 226. The Sixth Circuit Court of Appeals construed *Grava* as setting forth the following requirements for the issue-preclusion prong of res judicata: "(1) a prior final, valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action." *Hapgood v. Warren* (C.A.6, 1997), 127 F.3d 490, 493.

{¶ 85} Several developments followed construction of Lake Rockwell that render res judicata inappropriate: Akron's water consumption has increased from 12 to 42 MGD, Akron created the JEDDs and negotiated the water lease with ODNR in 1998, and the Ohio EPA increased regulation of effluent discharge. None of the issues presented in this suit could have been raised in 1913, and therefore, they are not precluded by the judgment entered in 1913.

### (v) First to Establish Public Use

{¶ 86} Finally, Akron asserts that the doctrine of first public use precludes the claims of the affected communities; however, this issue was neither raised by Akron in the court of appeals nor addressed by the court of appeals and may not be raised in this court for the first time in this appeal. *Moats v. Metro. Bank of Lima* (1974), 40 Ohio St.2d 47, 69 O.O.2d 323, 319 N.E.2d 603.

### (vi) The City of Kent—Standing

{¶ 87} As part of the cross-appeal, Kent asserts that it has standing to prosecute a cause of action against Akron because of Kent's riparian rights arising from ownership of property on the river, next to Standing Rock Cemetery. Kent also relies on the water rights retained by W.S. Kent when he sold some water rights to Akron in other riverfront property now owned by the city of Kent. According to Kent, the appellate court erred in its analysis by ignoring its ownership of the Standing Rock property and by misconstruing the language of W.S. Kent's deed to Akron.

{¶ 88} Akron counters that ownership of the Standing Rock property does not provide standing to Kent because Kent has never taken water from that part of the river and that, as to other properties, W.S. Kent's deed transferred all riparian rights to Akron, thereby leaving nothing for later transfer to the city of Kent.

{¶ 89} In its opinion, the court of appeals stated that there was "no indication in the record that the city of Kent owned any real property abutting the river which it did not acquire from W.S. Kent" and that Kent's "claim of riparian rights was predicated solely upon its acquisition of certain property from a private citizen, W.S. Kent." 156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 113, 91.

{¶ 90} Whether established facts confer standing to assert a claim is a matter of law. We review questions of law de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4. An owner of land abutting a river owns the accompanying riparian rights unless they are specifically procured by another person. *Balliett*, 65 Ohio St. 451, 63 N.E. 86; *Gavit's Admrs.*, 3 Ohio 495; *June v. Purcell* (1881), 36 Ohio St. 396, paragraph one of the syllabus; *Walker v. Bd. of Pub. Works* (1847), 16 Ohio 540, syllabus.

{¶ 91} Here, Kent proved at trial its undisputed ownership of the Standing Rock property together with the attendant riparian rights. The court of appeals apparently overlooked this evidence in its opinion. Furthermore, W.S. Kent reserved to himself all water "not appropriated" by Akron for its waterworks project. By virtue of its ownership of land abutting the Cuyahoga River and the rights it retains from the W.S. Kent deed, Kent proved its standing to present its position. Hence, we reverse the contrary outcome.

## D. Remaining Issues

{¶ 92} We now address the remaining issues before our court in this case.

### (i) Shalersville Well Field

{¶ 93} Akron contests the dismissal of its counterclaim for trespass and conversion of the groundwater at the Shalersville well field, contending that Portage County draws water from an aquifer that would otherwise flow into the Cuyahoga River and, therefore, infringes the rights it acquired by the 1912 ordinance when it appropriated "all the waters which may flow into and from said Cuyahoga River." According to Akron, Portage County's removal of drinking water from the aquifer eliminates Akron's ability to use that water, which would eventually flow into Lake Rockwell.

{¶ 94} Portage County asserts that water is not a chattel that may be converted and further contends that a trespass claim may be presented only by an owner; hence, because Portage County owns the Shalersville well field, it maintains that Akron cannot prevail on its conversion or trespass claims.

{¶ 95} In a recent case, *McNamara v. Rittman*, 107 Ohio St.3d 243, 2005-Ohio-6433, 838 N.E.2d 640, at ¶ 10, we held, "Ohio recognizes that landowners have a

property interest in the groundwater underlying their lands and that governmental interference with that right can constitute an unconstitutional taking."

{¶ 96} Portage County owns the land at the Shalersville well field, and, therefore, Portage County has a property interest in the groundwater underlying its land. Accordingly, Akron's position that it has ownership of the groundwater at this location because it eventually finds its way into the Cuyahoga River is not well taken, and we affirm the decision of the appellate court with respect to this claim.

### (ii) Violation of R.C. 1501.32

{¶ 97} The affected communities aver that Akron violated R.C. 1501.32, which requires a permit from ODNR before diversion of more than 100,000 gallons per day of water from the Lake Erie or Ohio River drainage basins.

{¶ 98} Akron maintains that this claim was properly dismissed because the affected communities failed to join the ODNR, a necessary party. Accordingly, we concern ourselves with whether ODNR should have been joined as a party to this litigation.

{¶ 99} A party's failure to join an interested and necessary party constitutes a jurisdictional defect that precludes the court from rendering a declaratory judgment. See *Plumbers & Steamfitters Local Union 83 v. Union Local School Dist. Bd. of Edn.* (1999), 86 Ohio St.3d 318, 321, 715 N.E.2d 127; *Zanesville v. Zanesville Canal & Mfg. Co.* (1953), 159 Ohio St. 203, 50 O.O. 254, 111 N.E.2d 922, at paragraph three of the syllabus. In *Cincinnati v. Whitman* (1975), 44 Ohio St.2d 58, 73 O.O.2d 283, 337 N.E.2d 773, we examined whether a litigant needed to join the director of the EPA as a party to a suit concerning the condition of Cincinnati's drinking water. We held that "when declaratory relief is sought which involves the validity or construction of a statute and affects the powers and duties of public officers, such officers should be made parties to the action or proceeding in which the relief is sought." Id. at 61, 73 O.O.2d 283, 337 N.E.2d 773. In that case, the director of the EPA had the exclusive duty to investigate and enforce compliance with statutory water quality standards and, therefore, failure to join the EPA, a necessary party, deprived the trial court of jurisdiction.

{¶ 100} The Director of Natural Resources is charged with the exclusive duty to enforce the provisions of R.C. 1501.32, which the affected communities allege Akron has violated. See R.C. 1501.31 and 1501.32(A), (D), (F), and (G). The affected communities challenge an informal determination of ODNR on a subject under the director's exclusive authority: i.e., whether Akron needed to obtain a permit before diverting water from the Cuyahoga River. However, the affected communities failed to name ODNR as a party to this litigation. See *Whitman,*

*supra.* Accordingly, we affirm the dismissal of the affected communities' claim that Akron violated R.C. 1501.32, because failure to join a necessary party deprived the trial court of jurisdiction to consider that claim.

### (iii) Public Access to Lake Rockwell

{¶ 101} Akron and Portage County dispute whether Akron may prohibit public use of Lake Rockwell. Portage County asserts that Akron may not close a navigable river. Akron presents three arguments in support of its right to exclude the public. First, it argues that it may exercise its police power in order to protect its source of drinking water. Second, it claims that Lake Rockwell is not a navigable body of water. And third, Akron argues that Portage County lacks standing because it failed to prove any injury resulting from the prohibition of recreational access.

{¶ 102} The trial court found that Akron failed to prove that boat-borne pollutants or deliberate terrorist attacks were credible threats to its drinking water. And it determined that both the middle and lower Cuyahoga River had the capacity for boating and that numerous termini were accessible by the public.

{¶ 103} The court of appeals held that while the trial court may have disagreed with Akron's reasoning, nothing in the record demonstrated that Akron's restriction of public access constituted a clear and palpable abuse of discretion. The court stated in its opinion: "While closing Lake Rockwell to boaters may prevent people from using it, Portage County failed to demonstrate that [Akron's] restriction was not reasonably adapted to the legitimate purpose of protecting [Akron's] primary water supply. In fact, it appears that the trial court impermissibly placed the burden on [Akron] to prove the legitimacy of its policy." 156 Ohio App.3d 657, 2004-Ohio-1665, 808 N.E.2d 444, ¶ 171. Further, the court determined that despite trial court findings about other locations on the river, no trial court finding specifically addressed the capacity or accessibility for boating on Lake Rockwell.

### (a) Akron's Use of Its Police Power

{¶ 104} Generally, legislative enactments of a municipality exercising its police power enjoy a presumption of validity, which can be rebutted if the opponent proves that the restriction is "unreasonable and arbitrary or ha[s] no real or substantial relation to the public health, safety, morals, or general welfare." *Dayton v. S.S. Kresge Co.* (1926), 114 Ohio St. 624, 4 Ohio Law Abs. 286, 151 N.E. 775, at paragraph one of the syllabus.

{¶ 105} In this case, nothing in the record suggests that Akron acted unreasonably or arbitrarily or that its restriction of public use has no real or substantial relation to the public health, safety, or general welfare. Akron presented

testimony that recreational use can increase the potential for an outbreak of waterborne diseases like cryptosporidiosis and giardiasis and that recreational boating and fishing would interfere with its algae- and weed-control procedures necessary to maintain high-quality drinking water. Therefore, Akron properly used its police power to restrict public access to Lake Rockwell.

### (b) Navigability Analysis

{¶ 106} Pursuant to federal law, the navigability of a body of water is determined by whether it is or ever was used in commerce. See *Miami Valley Conservancy Dist. v. Alexander* (C.A.6, 1982), 692 F.2d 447; *The Daniel Ball* (1870), 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999. In *E. Bay Sporting Club v. Miller* (1928), 118 Ohio St. 360, 6 Ohio Law Abs. 159, 161 N.E. 12, we stated, "Waters are navigable in law when they are used or are susceptible of being used in their ordinary condition as highways for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel upon water." We agree with the court of appeals that Lake Rockwell has never been shown to have been used for commerce. Thus, it is not navigable pursuant to that standard.

{¶ 107} Further, in *Mentor Harbor Yachting Club v. Mentor Lagoons, Inc.* (1959), 170 Ohio St. 193, 10 O.O.2d 131, 163 N.E.2d 373, paragraph four of the syllabus, we stated: "In determining the navigability of a watercourse for use either for recreation or for commerce, *consideration may be given* to the following factors: (1) Its capacity for boating in its natural condition, (2) its capacity for boating after the making of reasonable improvements, and (3) its accessibility by public termini." (Emphasis added.) Accord *Coleman v. Schaeffer* (1955), 163 Ohio St. 202, 56 O.O. 214, 126 N.E.2d 444.

{¶ 108} And we further examined the navigability of Lake Evans in *Ohio Water Serv. Co. v. Ressler* (1962), 173 Ohio St. 33, 38, 18 O.O.2d 243, 180 N.E.2d 2. We stated, "[N]ot all waters having a capacity for boating are considered as being legally 'navigable' so as to be 'public.' * * * Thus, it is not even contended that the waters of Lake Evans, although having ample capacity for boating, are legally 'navigable,' probably because there is not only no public terminus which can be reached by boating on or from those waters but also because they are not even reachable by boating from admittedly navigable waters such as Lake Erie, as were the waters held navigable in *Coleman v. Schaeffer* (1955), 163 Ohio St., 202 [56 O.O. 214], 126 N.E.(2d), 444, and *Yachting Club v. Mentor Lagoons,* supra (170 Ohio St., 193 [10 O.O.2d 131, 163 N.E.2d 373] )."

{¶ 109} In this case, although the trial court found that the middle and lower Cuyahoga River, located downstream from Lake Rockwell, had the capacity for

recreational boating and had accessible public termini for launching watercraft, it never found that the portion of the river at Lake Rockwell possessed any capacity for recreational boating or had any accessible termini for the public. The capacity of a body of water for recreational boating is to be considered but, standing alone, is not determinative. In considering whether Chippewa Lake constituted a navigable body of water, we determined that when a nonnavigable inland lake is privately owned, neither the public nor an owner of adjacent lands has a right to boat upon or take fish from its waters. *Lembeck v. Nye* (1890), 47 Ohio St. 336, 24 N.E. 686, at paragraph one (a) of the syllabus. In this case, we conclude that, as a proper exercise of its police power, Akron may exclude the public from Lake Rockwell and that Lake Rockwell is not a navigable body of water. In light of these determinations, Akron's allegation that Portage County lacks standing is moot. Accordingly, we affirm the decision of the appellate court that Akron may prohibit public use of Lake Rockwell.

## IV. Conclusion

{¶ 110} In summary, we conclude that in 1911, the state of Ohio conveyed to the city of Akron the right to the use of only the water that it held at the time of transfer. Because the record does not contain evidence that the state owned or controlled any rights in the Cuyahoga in 1911, in accordance with long-standing law regarding riparian rights in Ohio, Akron's claim to waters in the Cuyahoga must derive only from its ownership of riparian lands or other severed riparian rights to the river.

{¶ 111} Further, with respect to the release of water from the Rockwell Dam, we affirm the determination of the court of appeals to remand for issuance of a declaratory judgment; however, in conformity with the evidence in the record that the aggregate of 8.1 to 9.5 MGD is reasonable, we modify the decision of the court of appeals to specify that quantity, and we affirm the decision, as modified, to remand to the trial court for issuance of a declaratory judgment to that effect.

{¶ 112} With respect to the defenses presented by Akron, we affirm the judgment of the court of appeals that the defenses of statute of limitations, adverse possession, laches, and res judicata are not well taken, and we affirm the decisions regarding standing, except the decision as to the city of Kent, which we reverse. We do not address Akron's claim of first public use because Akron improperly raised this claim for the first time on appeal to this court.

{¶ 113} Finally, we affirm the decision of the court of appeals with respect to Akron's counterclaim against Portage County for water pumped from the Shal-

ersville well field, the affected communities' claim that Akron violated R.C. 1501.32, and Akron's denial of public access to Lake Rockwell.

{¶ 114} We leave the unenviable task of resolving future water-allocation issues in this region to appropriate planning authorities.

Judgment accordingly.

MOYER, C.J., O'CONNOR and LANZINGER, JJ., concur.

RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 115} I concur in the majority decision except for its holding regarding the recreational use of Lake Rockwell. I concur reluctantly in this court's determination as to the reasonable aggregate flow of water from Lake Rockwell. Instead of 8.1 to 9.5 MGD, I believe that the aggregate flow from Lake Rockwell should be 10.9 MGD, which, the trial court stated, testimony showed to be the natural flow of the Cuyahoga River. I question whether an aggregate release of 10.9 MGD would unreasonably impair the ability of Akron to fulfill its water commitments. Ultimately, that is a factual question, and I cannot say that the trial court's conclusion is against the manifest weight of the evidence.

{¶ 116} I dissent with regard to the majority's determination of the navigability of Lake Rockwell. Modern Ohio law regarding navigability is set forth in the syllabus of *Coleman v. Schaeffer* (1955), 163 Ohio St. 202, 56 O.O. 214, 126 N.E.2d 444, which reads:

{¶ 117} "1. In determining the navigability of a stream, consideration may be given to its availability for boating or sailing for pleasure and recreation as well as for pecuniary profit.

{¶ 118} "2. Such navigability may be determined on the basis of not only the natural condition of the stream but also of its availability for navigation after the making of reasonable improvements.

{¶ 119} "3. In determining the navigability of a stream, consideration may be given to its accessibility by public termini, but the presence or absence of such termini is not conclusive."

{¶ 120} In *Coleman,* the court determined that Beaver Creek, which flowed into Lake Erie near Lorain, was a navigable watercourse, even though at two miles from its mouth, "the creek became shallow and filled with vegetation and debris to the extent that even the smallest vessel could not navigate it." *Mentor Harbor Yachting Club v. Mentor Lagoons, Inc.* (1959), 170 Ohio St. 193, 196, 10

O.O.2d 131, 163 N.E.2d 373. In *Mentor Harbor*, this court found that·a channel connecting an inland body of water to Lake Erie had been navigable in its previous natural state even though at times that channel had been obstructed by a sand bar. In *Ohio Water Serv. Co. v. Ressler* (1962), 173 Ohio St. 33, 18 O.O.2d 243, 180 N.E.2d 2, this court found the privately owned reservoir in question, Lake Evans, to be nonnavigable because it was not connected to any navigable waters—it sat alone on privately owned land, connected to another reservoir by a ditch.

{¶ 121} In this case, we are not dealing with narrow channels occasionally obscured by sandbars or with drainage ditches or marshes. We are dealing with the dammed Cuyahoga River. The Cuyahoga is a major Ohio watercourse. Its significance for this state has been recognized since colonial times—in 1765, George Washington wrote, "Where the Cuyahoga River flows into Lake Erie shall rise a community of vast commercial importance."· http://www.britannica.com/ebi/article–198791.

{¶ 122} This court has not considered a navigability case like this before, in which a navigable watercourse has been dammed. Here, the trial court made the factual determination that the Cuyahoga River has a capacity for recreational boating both above and below Lake Rockwell. The majority's citation of *Lembeck v. Nye* (1890), 47 Ohio St. 336, 24 N.E. 686, is inapposite. Like *Ohio Water Serv.*, *Lembeck* is a case concerning an inland lake connected to no other navigable bodies of water.

{¶ 123} Lake Rockwell is the impoundment of the upper Cuyahoga, a navigable river. I would hold that the impoundment of a navigable watercourse is also navigable.

{¶ 124} The public has the right to use navigable watercourses. Pursuant to R.C. 743.17 and 743.25, a municipal corporation has the power to prevent or punish the pollution of its water supply. The record demonstrates that Akron's prohibition of all navigation on Lake Rockwell is unreasonable. The prohibition on all boating does not bear a substantial relationship to public health, safety, and general welfare and is an improper use of Akron's police power. *Hudson v. Albrecht, Inc.* (1984), 9 Ohio St.3d 69, 72, 9 OBR 273, 458 N.E.2d 852.

{¶ 125} The trial court found that nonmotorized boating did not create a credible threat to Akron's water supply. State Route 14, which, according to the trial court, is a major truck route and heavily traveled roadway, runs across Lake Rockwell, destroying any characterization of Lake Rockwell as an Edenic pool untouched by the unclean hand of modern man. The court also found that public recreational boating is allowed on many other publicly controlled lakes that provide drinking water for Ohioans. The court concluded as a factual matter that

"public non-motorized boating access to Lake Rockwell will not increase the likelihood of harm to the public water supply or Lake Rockwell." I believe that the trial court got it right.

RESNICK and LUNDBERG STRATTON, JJ., concur in the foregoing opinion.

132

# APPENDIX A

The Cuyahoga River, Landsat 7 Satellite Image, Sept. 5, 2000
Trial Exhibit A-1399A
(modified to add location references)

A) Geauga County

1) Shalersville Wells
2) Rockwell Dam
3) Cuyahoga River — Breakneck Creek Confluence
4) Ravenna
5) Kent
6) Munroe Falls
7) Silver Lake

B) Portage County

8) Cuyahoga Falls
9) Portage County — Summit County Line
10) Akron
11) Akron Wastewater Plant
12) Cuyahoga — Ohio Canal Connection
13) Shalersville Return
14) Tuscarawas River
15) Little Cuyahoga River

## APPENDIX B

### Propositions of Law of Appellant

{¶ 126} Proposition of Law No. I: The State's grant to the city of Akron of the perpetual right to divert the Cuyahoga River at any point and to use its water for all lawful waterworks purposes, with no limitation on the quantity used and no obligation to maintain flow in any section of the river upstream from its connection to the Ohio canal, conferred on that City all of the powers and immunities of the State to control those sections of that river and to divert all of its water.

{¶ 127} Proposition of Law No. II: The State's grant also applies to all tributaries of the Cuyahoga River.

{¶ 128} Proposition of Law No. III: Once a municipality has established its use of the water of a river for a public water supply, another municipality may not thereafter acquire downstream property and assert riparian rights to alter the first municipality's use.

{¶ 129} Proposition of Law No. IV: A city's appropriation of all water originating above the site of a dam, and of all rights and interest in that water, together with its taking and diversion of that water, eliminates all common law rights of downstream riparian owners to future flow of that water past their land, and those owners or their successors must either act to recover their property rights within 21 years from the appropriation and taking or seek compensation within six years for that reduction of their riparian rights, and thereafter they are barred from any claim arising from loss or flow of that water.

{¶ 130} Proposition of Law No. V: After the expiration of 21 years with no challenge by a downstream riparian owner or his successor in interest to the open, notorious and continuous seizure, interruption of flow and exercise of control of the water of a river at the site of a dam, the rights associated with the riparian property to require the water originating above that dam site to flow past that downstream property are transferred by operation of law to the party exercising that control.

{¶ 131} Proposition of Law No. VI: A city's appropriation of all water in a river or that may flow into it, above a point on that river, precludes all property owners upstream of that point from thereafter removing water without return above that point, and such a removal of water violates a property right of the appropriating city.

{¶ 132} Proposition of Law No. VII: When one municipality fails to assert a known claim to challenge the rights and obligations of another municipality for a period of over 80 years, during which the second municipality has made substantial investments and incurred obligations to third parties in good faith reliance on

its stated legal rights, the first municipality is precluded by both laches and statutes of limitations from asserting that claim.

{¶ 133} Proposition of Law No. VIII: A final judgment after a trial on the merits, denying an injunction to preclude both an appropriation by a city of all water originating above a designated point on a river and that city's diversion of the water and elimination of the flow in the river below that point, precludes by *res judicata* a subsequent tort claim by the same plaintiff that is premised on the city's actual control, diversion and use of the appropriated water and reduction of flow in the river.

{¶ 134} Proposition of Law No. IX: Where a trial court finds that a riparian owner's use of water has been reasonable and that there has been no showing of either irreparable injury or threat of impending injury to other riparian owners, and those conclusions are affirmed on appeal, the trial court's refusal to issue a declaratory judgment specifying any different hypothetical circumstances that could be viewed in the future as unreasonable does not constitute an abuse of discretion.

**Propositions of Law of Cross–Appellees**

{¶ 135} Proposition of Law No. I: Where a deed conveys only the riparian rights necessary to supply water for the grantee and its residents, the grantor's successors can enforce the remaining riparian rights.

{¶ 136} Proposition of Law No. II: An upstream riparian's disproportionate impoundment of water that leaves insufficient flow for downstream users and the river's basic functions is a nuisance and an interference with the use of water requiring a remedy that restores the habitat and basic functions of the river.

{¶ 137} Proposition of Law No. III: Where a constant flow of at least 8.5 MGD is essential for the survival of aquatic life and stable downstream permit limits, an upstream riparian must maintain such a constant flow in the river.

{¶ 138} Proposition of Law No. IV: An injunction must issue where tortious conduct is ongoing or likely to resume.

{¶ 139} Proposition of Law No. V: A municipality's diversion of water from the Cuyahoga River basin to the Ohio River basin without a permit violates R.C. 1501.32.

{¶ 140} Proposition of Law No. VI: A municipality has no authority to adopt a regulation closing a navigable river in defiance of the state's navigational easement held in trust for the public.

Jones Day, J. Kevin Cogan, Jack A. Van Kley, and Jonathan K. Stock; James R. Silver, City of Kent Law Director; Virgil E. Arrington, City of Cuyahoga Falls Law Director; Amer Cunningham Co., L.P.A., and Jack Morrison Jr., Munroe Falls Law Director; Robert W. Heydorn, Village of Silver Lake Solicitor, for appellees and cross-appellant.

Max Rothal, Akron Director of Law, and Cheri B. Carroll; Thompson Hine, L.L.P., Leslie W. Jacobs, Robert F. Ware, and Louis L. McMahon, for appellant and cross-appellee.

Mazanec, Raskin & Ryder Co., L.P.A., John T. McLandrich, and Robert F. Cathcart; Frank J. Cimino, City of Ravenna Law Director, for appellee city of Ravenna.

Barry M. Byron, Stephen L. Byron, and John Gotherman, for amicus curiae, Ohio Municipal Attorneys Association.