OPINION
{¶ 1} Plaintiff-Appellant Brian Egbert ("Egbert") appeals from the April 24, 2008 Decision/Order of the Court of Common Pleas, Shelby County, Ohio affirming the Ohio Department of Agriculture's ("ODA") order suspending Egbert's Ohio Livestock Dealers License ("license").
 {¶ 2} This matter stems from Egbert's role in the sale of hogs infected with mycobacterium avium, commonly referred to as avian tuberculosis. Egbert acquired these hogs from another farmer in Ohio at a sharply discounted rate. When he purchased these hogs, Egbert was told that the hogs were infected with tuberculosis, although not which particular type of tuberculosis. Egbert was also told that the hogs had internal lesions that could not be detected until they were sent to slaughter.
 {¶ 3} After acquiring these hogs, Egbert contacted other livestock dealers, who helped send these diseased hogs to various slaughterhouses. When Egbert explained the condition of these hogs to these other dealers, he stated that they did *Page 3 
have internal lesions, but failed to mention that they had tuberculosis.[1] In fact, Egbert went so far as to state that these hogs had something like tuberculosis, but it was not tuberculosis. This conduct gave rise to the eventual involvement of the Ohio Department of Agriculture.
 {¶ 4} In a letter dated August 14, 2006 the ODA informed Egbert of its proposal to suspend or revoke his license based on violations of R.C. 943.05(A)(2) (5) committed during his involvement in the sale of the diseased hogs. Specifically, the letter alleged that Egbert had failed to maintain proper records for the infected hogs, had made false and misleading statements regarding the health of the hogs, and had failed to disclose the health and physical condition of the hogs.
 {¶ 5} Pursuant to the letter dated August 14, 2006 Egbert requested an administrative hearing on the ODA's allegations. Hearings were held on December 5, 2006, February 8, 2007, March 19, 2007, and April 20, 2007.
 {¶ 6} On approximately July 20, 2007 the ODA hearing officer issued his report finding that Egbert had violated R.C. 943.05(A)(2) and recommending that Egbert's license be suspended for a period of eighteen months. *Page 4 
 {¶ 7} On August 8, 2007 Egbert filed objections to the finding of the hearing officer. An order signed by the director of the ODA was issued on August 21, 2007 affirming the finding of the hearing officer, but also finding that Egbert had violated R.C. 943.05(A)(5). The director's order affirmed the eighteen month licensure suspension.
 {¶ 8} On August 24, 2007 Egbert appealed to the Court of Common Pleas of Shelby County, Ohio. Both parties filed briefs on appeal. On April 24, 2008 the Court of Common Pleas issued a Decision/Order affirming the ODA's order suspending Egbert's license based on violations of R.C. 943.05(A)(2). The Court of Common Pleas found that Egbert did not violate R.C. 943.05(A)(5).
 {¶ 9} Egbert now appeals, asserting two assignments of error.
 ASSIGNMENT OF ERROR I THE COURT OF COMMON PLEAS ABUSED ITS DISCRETION WHEN IT FOUND THAT THE OHIO DEPARTMENT OF AGRICULTURE PROVED BY RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE THAT APPELLANT VIOLATED R.C. 943.05(A)(2).
 ASSIGNMENT OF ERROR II THE COURT OF COMMON PLEAS ABUSED ITS DISCRETION WHEN IT FOUND THAT THE OHIO DEPARTMENT OF AGRICULTURE'S CHARGE LETTER PROVIDED THE APPELLANT-LICENSEE WITH ADEQUATE NOTICE OF THE PRECISE NATURE OF THE CHARGES AGAINST HIM.
 First Assignment of Error *Page 5 {¶ 10} In his first assignment of error, Egbert argues that the Court of Common Pleas abused its discretion by affirming the decision of the ODA. The standard of review for a common pleas court reviewing the judgment of an administrative agency is to determine if the agency's order is supported by reliable, probative, and substantial evidence, and is in accordance with law. Adams v. Crawford County Bd of Com'rs
3rd Dist. No. 3-07-19, 2007-Ohio-6966 at ¶ 14 citingPons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621,614 N.E.2d 748, 750-751, 1993-Ohio-122. "Reliable" evidence is evidence that is dependable and may be confidently trusted. Our Place, Inc. v. OhioLiquor Control Comm. (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303. In order to be reliable, there must be a reasonable probability that the evidence is true. Id. "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. Id. "Substantial" evidence is evidence with some weight; it must have importance and value. Id.
 {¶ 11} The common pleas court's "review of the administrative record is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court `must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof" Lies v. Veterinary Medical Bd. (1981),2 Ohio App.3d 204, 207, 441 N.E.2d 584 quoting Andrews v. Bd. of LiquorControl (1955), 164 Ohio St. 275, 280, *Page 6 131 N.E.2d 390. Even though the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, the findings of the agency are not conclusive. Univ. of Cincinnati v.Conrad (1980), 63 Ohio St.2d 108, 111, 407 N.E.2d 1265.
 {¶ 12} Typically when this Court reviews an appeal from an administrative agency, we must affirm the judgment of the common pleas court unless we find the lower court has abused its discretion in entering the judgment on appeal. Kennedy v. Marion Corr. Inst. (1994),69 Ohio St.3d 20, 630 N.E.2d 324, 1994-Ohio-83. An abuse of discretion connotes more than a mere error of judgment; it implies that the trial court's attitude is arbitrary, unreasonable, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. However, where the appeal presents both an evidentiary question and a question of law, the evidentiary issue is to be reviewed under an abuse of discretion standard, and the question of law is to be reviewed denovo. Adams v. Crawford County Bd. of Com'rs 3rd Dist. No. 3-07-19, 2007-Ohio-6966, at ¶ 16.
(1) Language of R.C. 943.05(A)(2)
 {¶ 13} In the first part of his first assignment of error, Egbert argues that the ODA and the Court of Common Pleas both incorrectly interpreted R.C. 943.05(A)(2), which provides as follows:
 (A) The director of agriculture may refuse to grant or may suspend a dealer's or broker's license, without prior hearing, *Page 7 when he determines from evidence presented to him that there is reasonable cause to believe any of the following situations exist:
 * * *
 (2) Where there have been false or misleading statements as to the health or physical condition of the animals with regard to official tests or quantity of animals, or the practice of fraud or misrepresentation in connection therewith or in the buying or receiving of animals or receiving, selling, exchanging, soliciting, or negotiating the sale, resale, exchange, weighing, or shipment of animals;
 {¶ 14} When considering R.C. 943.05(A)(2) the Court of Common Pleas found as follows:
 This Court does not find that false or misleading statements as to the health or physical condition of animals regarding official tests is the exclusive means of finding false or misleading statements, or fraud or misrepresentation. The statute attempts to enumerate a number of different circumstances in which a dealer's license might be suspended for false or misleading statements or fraud or misrepresentation including the making of statements in the buying or receiving or selling of animals.
 {¶ 15} Specifically, Egbert appears to argue that the Court of Common Pleas erred when it applied the prohibition against false or misleading statements to the activity of selling animals. The Ohio Supreme Court has recently reexamined how a court is to determine the legislative intent of statutes as follows:
 We look to the plain language of the statute to determine the legislative intent. State ex rel. Burrows v. Indus. Comm. (1997), 78 Ohio St.3d 78, 81, 676 N.E.2d 519. We apply a statute as written when its meaning is unambiguous and definite. Portage *Page 8 Cty. Bd. of Commrs. v. Akron, 109 Ohio St.3d 106, 2006-Ohio-954, 846 N.E.2d 478, ¶ 52, citing State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn. (1996), 74 Ohio St.3d 543, 545, 660 N.E.2d 463. Finally, an unambiguous statute must be applied in a manner consistent with the plain meaning of the statutory language. Burrows, 78 Ohio St.3d at 81, 676 N.E.2d 519.
Kraynak v. Youngstown City School Dist. Bd. of Edn., 118 Ohio St.3d 400,402, 89 N.E.2d 528, 2008-Ohio-2618.
 {¶ 16} We note that no other court has interpreted R.C. 943.05(A)(2). However, when reading R.C. 943.05(A)(2) this Court believes that the prohibition against "false or misleading statements" applies to "the health or physical condition of the animals with regard to official tests" or to the "quantity of animals." We find this interpretation based on the lack of serial commas in this provision. Moreover, we find that the prohibition against "the practice of fraud or misrepresentation" applies to both the activities "in connection therewith or in the buying or receiving of animals or receiving, selling, exchanging, soliciting, or negotiating the sale, resale, exchange, weighing, or shipment of animals."
 {¶ 17} Therefore, in as much as Egbert argues that this statute contains two separate prohibitions, we agree. However, when viewing the Court of Common Pleas' interpretation of R.C. 943.05(A)(2), we cannot say, from the language of the Decision/Order, that it incorrectly interpreted R.C. 943.05(A)(2). Moreover, we cannot find a substantial distinction between "false or misleading statements" *Page 9 
and a "misrepresentation," such that there would be a meaningful distinction between the application of either term to the act of selling livestock.
(2) Application of R.C. 943.05(A)(2)
 {¶ 18} Next, Egbert argues that regardless of how the statute is interpreted, he did not make any remark that was "false or misleading" or a "misrepresentation" of the condition of the hogs. The record before this court contains significant testimony concerning what Egbert actually told the persons with whom he dealt in selling the hogs, as well as what he told the slaughterhouses that were processing the hogs.
 {¶ 19} Egbert became involved with the hogs in question after he was contacted by Michael Siefring, the farmer who had been caring for the hogs. Apparently, when he purchased the hogs from Mercer Landmark, they were infected with avian tuberculosis, which they contracted from being kept in barns that had previously been used to hold poultry. Siefring first attempted to sell the hogs on February 19, 2006 in a sample run to the packing plant. However, approximately 50 percent of the hogs sent to the packing plant were condemned, indicating that there was a problem with the health of the hogs. Moreover, the packing plant refused to accept any more hogs from this herd.
 {¶ 20} At the same time Siefring was informed that approximately half of the hogs he sent to packing were condemned, he was informed that the hogs had *Page 10 
tuberculosis, which was the reason for the condemnation. According to Siefring, he did not know the hogs specifically had avian tuberculosis. Instead, Siefring just believed it was some type of tuberculosis because that was what was represented on the sheet he received from the packing company. After receiving this information, Siefring was very limited in where he could sell his hogs and contacted Egbert in March of 2006.
 {¶ 21} According to Siefring, he contacted Egbert stating "we got these hogs . . . nobody will take them." (Tr.p. 198). After Egbert asked what the hogs were infected with Siefring stated "TB," describing it as "they just got lesions in their lungs and in their stomach." (Id.). Egbert then called, saying he had a buyer for the hogs, stating that the buyer would purchase the hogs for $30 per head. After the $30 per head was paid to Siefring, he was no longer a part of these transactions, selling these hogs. (Tr.p. 203).
 {¶ 22} Egbert then began finding purchasers for the hogs. Brian Gaubeaux, who works for Heinhold Hog Market testified that he purchased some of the hogs in question from Ebgert and Lambright in March 2006. Heinhold is a slaughter facility that, according to Gaubeaux, takes blemished hogs, such as the hogs at issue here. Accordingly, Gaubeaux knew, due to the nature of his business, that these hogs were not "100-percent good hogs," when he arranged to send them to the packing plant. *Page 11 
 {¶ 23} Gaubeaux testified that he was told that the hogs had "internal abscesses." (Tr.p. 22). However, the term avian tuberculosis was never disclosed as the cause of the abscesses. It was at the packing plant, when the hogs were slaughtered, that Gaubeaux discovered that the hogs had some form of tuberculosis. Approximately fifty percent of the hogs Gaubeaux received were condemned due to the lesions caused by avian tuberculosis.
 {¶ 24} Keith Lambright, who also holds a livestock dealers license, testified that he worked with Egbert to find a buyer for the hogs. When Lambright was originally contacted by Egbert, he was told that the hogs had lesions that were resulting in a high condemnation rate at slaughter. However, Lambright did not specifically know that the hogs had avian tuberculosis until they were slaughtered.
 Q. Did you eventually become aware of the fact that these hogs had been exposed to avian tuberculosis?
 A. Yes. After the thing blew up, that was the word, yes.
 Q. When did you first find out that these animals had avian tuberculosis?
 A. I cannot give you the exact date. After everything went, that was the word that came out.
(Tr.p. 51).
 {¶ 25} Moreover, Lambright testified that when he spoke to Gaubeaux that he did not tell him that the hogs specifically had avian tuberculosis, instead telling Gaubeaux that the hogs had lesions. According to Lambright, he was not told that *Page 12 
the hogs had avian tuberculosis until after slaughter had occurred and an investigation was underway. After the investigation commenced, Lambright learned, for the first time, that the hogs had been exposed to avian tuberculosis.
 {¶ 26} David Emmons, another livestock dealer, also testified that he was contacted by Egbert concerning the sale of the hogs. When Egbert contacted him, Emmons was only told that the hogs had lesions, but not that they had been exposed to avian tuberculosis. Emmons did not find out that the hogs had been exposed to avian tuberculosis until several weeks after they were sold, when payments were stopped on the checks issued as payment for the hogs. Three different stockyards stopped payment on the hogs saying that "the hogs were sick." (Tr.p. 91).
 {¶ 27} In disposing of the exposed hogs, Egbert also dealt with Leroy H. Baker, a licensed livestock dealer. Baker stated that Egbert contacted him in March of 2006 concerning hogs that a local farmer was not able to sell. According to Baker, the agreement was that he and Egbert would partner to sell the hogs, splitting whatever profits or losses occurred on the deal equally. This particular transaction involved moving 398 hogs. When Egbert described the condition of the hogs to Baker, he told him "something about wet sawdust and they had lesions on them and it was a form of like TB. It was like TB, but it wasn't TB. I knew it wouldn't be, or the state would have had them quarantined." *Page 13 
(Tr.p. 117). Although Baker knew something was wrong with the hogs, he did not communicate this to buyers who purchased the hogs. He testified that he did not know that these hogs were infected with avian tuberculosis. (Tr.p. 128).
 {¶ 28} It appears from the record, however, the Egbert and Baker did not split the proceeds from the hogs. Instead, Egbert sold the hogs to Baker who lost money on the transaction after purchasing the hogs from Egbert.
 {¶ 29} In all of these instances, where Egbert had the opportunity to disclose to Lambright, Emmons, Baker, or Heinhold, he did not state that the original group of hogs sent to slaughter by Siefring had tested positive for tuberculosis. Moreover, in several instances, Egbert testified that the hogs did not, in fact, have tuberculosis, calling it "like tuberculosis, but not tuberculosis." From the testimony given at the Department of Agriculture hearings, it is evident to this Court that Egbert was aware that, at a minimum, these hogs had some form of tuberculosis. Because he did not disclose that fact to any other parties involved in selling this hogs, we find that the Court of Common Pleas did not abuse its discretion in finding that Egbert's statements fall with the prohibitions enumerated in R.C. 943.05(A)(2).
 {¶ 30} Egbert also appears to argue that the Court of Common Pleas erred in finding he violated R.C. 943.05(A)(2) because the Court of Common Pleas found that the fact that Lambright, Emmons and Baker had knowledge of the *Page 14 
condition of the hogs did not absolve Egbert of his duty of any additional disclosure. However, as noted earlier, Siefring informed Egbert that the disease causing the lesions on these hogs was tuberculosis. We have already noted that Egbert did not reveal that the hogs had tuberculosis to either Lambright, Emmons or Baker. Moreover, Egbert often went out of his way to deny that these hogs were infected with TB, stating that the condition was like tuberculosis, but not really tuberculosis, or in the alternative, just mentioning that the hogs had lesions.
 {¶ 31} This Court fails to see how, when Egbert knew that these hogs had tuberculosis, telling other livestock dealers that the hogs were not infected with tuberculosis does not qualify as a misrepresentation. Moreover, we find Egbert's argument that "[apparently, the ODA and the Judge held Egbert to a standard of language that ordinary people just don't follow" to be incredulous. Egbert holds a license from the ODA, moving him outside of the standards of any other farmer. Moreover, he specifically withheld his knowledge that these hogs were infected with tuberculosis.
 {¶ 32} Finally, Egbert would like us to read into R.C. 943.05 some requirement of intent to mislead or a requirement of reliance on behalf of subsequent buyers. However, the plain language of R.C. 943.05
contemplates neither of these requirements. The statute only requires that the ODA find that fraud or misrepresentation has occurred with respect to the condition of certain *Page 15 
animals. Therefore, we find that, under the plain language of the statute, Egbert mislead his buyers as to what they were getting when they purchased these hogs. Accordingly, Egbert's first assignment of error is overruled.
 Second Assignment of Error {¶ 33} Egbert also argues that given the language of the ODA Charge Letter of August 14, 2006, he was not provided with adequate notice of the charges against him. The due process rights guaranteed by the United States and Ohio Constitutions apply in administrative proceedings.LTV Steel Co. v. Indus. Comm. (2000), 140 Ohio App.3d 680, 688,748 N.E.2d 1176. In Chirila v. Ohio State Chiropractic Bd. (2001),145 Ohio App.3d 589, 763 N.E.2d 1192, the Tenth District Court of Appeals addressed the application of due process to administrative proceedings:
 "[D]ue process is a flexible concept and calls for such procedural safeguards as the particular situation demands." Id. at 688-689, 748 N.E.2d 1176. In Korn v. Ohio State Med. Bd. (1988), 61 Ohio App.3d 677, 684, 573 N.E.2d 1100, this court addressed what procedural due process requires in an administrative hearing: "The fundamental requirement of procedural due process is notice and hearing, that is, an opportunity to be heard." "Procedural due process also embodies the concept of fundamental fairness. Sohi v. Ohio State Dental Bd. (1998), 130 Ohio App.3d 414, 422, 720 N.E.2d 187. Additionally, this court indicated in Korn that "[n]otice and hearing are necessary to comply with due process in an administrative proceeding which revokes an individual's license to practice a profession." Korn at 684, 573 N.E.2d 1100. Similarly, the Eighth District has noted that "[d]ue process mandates that prior to an administrative action which results in a deprivation of an individual's liberty or *Page 16 property, the governmental agency must afford that individual reasonable notice and opportunity to be heard." Alcover v. Ohio State Med. Bd.
(Dec. 10, 1987), Cuyahoga App. No. 54292, unreported, 1987 WL 27517. In LTV Steel, this court employed the test for examining due process guarantees in the context of administrative agency proceedings:
 The United States Supreme Court and Ohio Supreme Court both use the test expressed in Mathews v. Eldridge (1976), 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33-34, as the basis for due process analysis in administrative hearings. See, e.g., Mackey v. Montrym
(1979), 443 U.S. 1, 10, 99 S.Ct. 2612, 2616-2617, 61 L.Ed.2d 321, 329-330; Doyle [ v. Ohio Bur. of Motor Vehicles (1990), 51 Ohio St.3d 46, 52], 554 N.E.2d 97. Under that test, the court must weigh the following three factors to determine whether the process granted in the administrative proceeding is constitutionally adequate (1) the private interest at stake, (2) the risk of an erroneous deprivation of that interest and the probable value of additional procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. Mathews, at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33-34." LTV Steel, at 689, 748 N.E.2d 1176.
Chirila, 145 Ohio App.3d at 593.
 {¶ 34} In the present case, the letter notifying Egbert of the possible violations first notified Egbert of the ODA's proposal to suspend or revoke his livestock dealers license, stating that the proposal was based on violation of R.C. 943.05(A)(2) (5). The charge letter also quoted the language of R.C. 943.05(A)(2) (5). For example, the second violation articulated in the charge letter stated as follows: *Page 17 
 On or about March 11, 2006 you entered into an agreement with Dave Emmons pursuant to which Mr. Emmons agreed to act as your agent, and on your behalf, sell 482 of the hogs you purchased from Mike Siefring. You were improper in your business dealing with Mr. Emmons in that you made false and misleading statements regarding the health of the hogs and you failed to disclose that the animals had been exposed to avian tuberculosis (TB) and would likely suffer from a high incidence of avian TB. The failure to disclose the health or physical condition of the hogs constitutes a violation of R.C. 943.05(A)(2).
 {¶ 35} Egbert makes to two separate argument concerning why the charging letter did not afford him due process. First, he argues that because, in finding a violation of R.C. 943.05(A)(2), the ODA mentioned the economic impact on slaughter houses, he was not afforded proper notice, as this conduct was not mentioned in the charging letter. Second, he argues that the ODA finding that Egbert had constructive knowledge that the hogs had avian tuberculosis was not a violation specifically stated in the charging letter and therefore, amounted to a violation of due process.
 {¶ 36} The ODA decision, in pertinent part, is as follows:
 Contrary to the assertions made in the statement of violations, Mr. Sefring [sic] apparently did not tell respondent that the hogs in question had been exposed to avian tuberculosis. Instead, he did; however, tell Mr. Egbert that the hogs had been exposed to tuberculosis without clarifying what type of tuberculosis was involved. This inconsistency between the charge letter and the evidence actually presented, while troublesome, does not constitute fatal error. The knowledge that Sefring [sic] hogs had been exposed to tuberculosis of any form was of critical importance and should have been unequivocally conveyed to all persons involved with moving *Page 18 these hogs to market. Arguably, the omission of the term avian from the description of the hogs' health problems given to Mr. Egbert could leave one to conclude that the hogs might have been exposed to mammalian TB, a disease that could be transmitted to humans. Thus the importance of conveying precise unambiguous information is even heightened. A careful examination of the record, especially the testimony of Keith Lambright, Leroy Baker and David Emmons convinces this hearing officer that Mr. Egbert failed to disclose in a complete, transparent fashion the critical information he had received or had gleaned regarding these hogs. He spoke of lesions and adhesions, which can be caused by many diseases. He told Mr. Baker that the condition of these hogs is "like TB" but not TB. He also related to the other licensees who were delegated the task of disposing of the hogs that more than the usual number would be condemned. They also knew that the price paid for these hogs by Mr. Egbert was far less than would be paid for a Grade A hog. Although this information certainly would raise "red flags" among knowledgeable hog dealers it fails to convey the one critical point about TB exposure.
 * * *
 I, therefore, conclude that Brian Egbert has violated Section 943.05(A)(2), O.R.C., by misrepresenting the health of the hogs he purchased from Mike Sefring [sic]. Moreover, by conveying only minimal and incomplete information about these hogs, many of whom had contracted avian tuberculosis he was instrumental in instituting the process that lead to economic losses to slaughter houses. . .
 {¶ 37} We do not find that the minor deviations from the charging letter at issue in the present case are significant enough to rise to the level of a due process violation. Although it was discovered at the hearing that Egbert was not told that the hogs had avian tuberculosis, Siefring testified that he did tell Egbert that the hogs had tested positive, at slaughter, for a form of tuberculosis. Therefore, *Page 19 
Egbert knew he was accused of concealing information about the health of the hogs before the hearing and could have suffered no erroneous deprivation as a result of the deviation between the evidence adduced and the charged conduct.
 {¶ 38} Moreover, when the Court of Common Pleas reviewed the ODA's judgment, the court found as follows:
 Mike Siefring told Brian Egbert that he was having trouble moving some hogs. Egbert asked Siefring what the hogs had. Siefring told Egbert that they had TB. He apparently did not particularize what kind of TB.
 Egbert then contacted Keith Lambright, Leroy Baker, and Dave Emmons to move the hogs. To a greater or lesser extent Lambright, Baker, and Emmons knew that there was something wrong with the hogs, but never received full disclosure as to the exact nature of the conditions. Egbert did not tell Lambright or Emmons that the hogs had TB. Egbert told Baker that the hogs had something like TB, but it wasn't TB. Egbert's statement to Baker was actually an affirmative misrepresentation of facts unlike his omission of facts to Lambright and Emmons.
 * * *
 The fact that Lambright, Emmons and Baker may have been aware that something was wrong with the hogs does not excuse Egbert's omission to disclose all information that he had. Indeed, in the case of Baker he affirmatively denied the condition of TB in the hogs even though he had been told by Siefring that the hogs had TB.
 {¶ 39} The Court of Common Pleas found no due process violation with respect to the specificity of the charging letter. We cannot find that the Court of Common Pleas abused its discretion in its finding. *Page 20 
 {¶ 40} With respect to the ODA hearing officer's statements concerning the impact of Egbert's actions on the slaughter industry, we note that those statements came after the hearing officer found a violation and do not constitute separate findings. That statement was only an independent thought of the hearing officer and perhaps a policy rationale for the enforcement of R.C. 943.05(A)(2). Accordingly, Egbert's second assignment of error is overruled.
 {¶ 41} Based on the forgoing, the April 24, 2008 Decision/Order of the Court of Common Pleas, Shelby County, Ohio affirming the Ohio Department of Agriculture's order suspending Egbert's Ohio Livestock Dealers License is affirmed.
Judgment Affirmed.
 PRESTON and ROGERS, J.J., concur.
[1] It appears from the record that there are two main types of tuberculosis of concern to hogs farmers. First, there is mammalian tuberculosis, which apparently results in quarantine of the infected hogs and is transmissible between animals. Second, avian tuberculosis infects hogs exposed to the disease, but is not transmissible between hogs and does not result in the animals being quarantined. *Page 1