[Cite as *State v. Haynes*, 2020-Ohio-6977.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. WD-19-035

    Appellee                              Trial Court No. 2018CR0070

v.

Ernie E. Haynes                          **DECISION AND JUDGMENT**

    Appellant                             Decided:  December 30, 2020

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Thomas A. Matuszak and David T. Harold, Assistant Prosecuting
Attorneys, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**OSOWIK, J.**

### Introduction

{¶ 1}  The defendant-appellant, Ernie Haynes, was convicted of abduction in the

Wood County Court of Common Pleas for the illegal removal of his three grandsons and

sentenced to community control. On appeal, Haynes raises multiple trial-related errors, including that the state failed to present legally sufficient evidence that he removed the children "by force or threat." As set forth below, we affirm the trial court's judgment.

**Facts and Procedural History**

{¶ 2} Ernie Haynes (hereinafter "the defendant") is grandfather to J.H.-H. (then aged 5), J.H.-H. (also aged 5 but 11 months younger), and J.H.-H. (aged 2), all boys. The defendant is alleged to have abducted his grandsons by removing them from the place where they were found, on December 19, 2017. The record established that the defendant personally removed the two younger boys from a friend's home and drove them away in his truck. He instructed his wife, Marcella Spence Haynes (hereinafter "Marcella"), to pick the oldest boy up from school, which she did, and she removed him from the school by car.

{¶ 3} At trial, the state presented the following evidence: The mother of the boys, Jennifer Haynes, died suddenly on December 12, 2017. The evidence strongly suggests that Jennifer Haynes (hereinafter "Jennifer") died of a drug overdose. Jennifer lived in Fostoria, Ohio, in Seneca County, with James Hill-Hernandez. The unmarried couple had been in a relationship for seven years and were parents to the three boys. When she died, Jennifer was expecting their fourth child, and her death caused the infant to be born two months prematurely and with underdeveloped lungs. The infant was "life-flighted" to Toledo Children's Hospital in Lucas County and remained there until May of

2.

2018, when he died.  Jennifer was also mother to three older children, all girls.  The girls were not fathered by Hill-Hernandez and are not the subject of this criminal case.

{¶ 4}   Much of the testimony at trial focused on the week in between Jennifer's death and the abductions.  During that time, the three boys were cared for mostly by the defendant and by family friends, John and Amanda Decker.  Even before Jennifer's death, the Deckers "had the kids the majority of the time [including] during the week."

{¶ 5}   The funeral was held on December 18, 2017 in Fostoria, after which the defendant "took the boys to [his] house" to change clothes.  The plan was for Hill-Hernandez to "pick the boys up and take them to the hospital [in Toledo] so they could visit with their [newborn baby] brother."   When Hill-Hernandez arrived, Marcella told him that "she wanted them back by [8 p.m.]" because the oldest son had school the next day.  When Hill-Hernandez told Marcella that "there [was] no way" he could meet that time-table—given the distance to Toledo and back—Marcella "blew up."  The defendant "changed" too and said, "no" and "that's it.  Go get your other two boys and bring them in[side]."  The defendant told Hill-Hernandez that "he may not have done right by his children but he's going to do right by [your] children, and nobody is going to have anything to say about it."  The defendant "gave [Hill-Hernandez] the understanding that [he] had no rights over [his own] children."  Hill-Hernandez "didn't want any conflict, altercations or anything," and he left, without the boys, and drove to the Toledo Hospital where he "stayed the night."

3.

{¶ 6}   The next day, December 19, 2017, Hill-Hernandez "got up early * * * and * * * drove from Toledo to Tiffin" where he filed a motion in the Juvenile Division of the Seneca County Court of Common Pleas requesting temporary legal custody of his four sons.  His purpose in doing so was to "establish [his] rights as [the] children's father."  A magistrate granted the motion at 2:58 p.m., that same day, and set a hearing for January 24, 2018.

{¶ 7}   Hill-Hernandez began calling the defendant and Marcella to tell them that he had "obtained [his] parental rights as a father" and "I want my children."  He also sent a picture of the magistrate's order to the defendant's phone.  Neither the defendant nor Marcella answered their phones or responded to messages.  So, Hill-Hernandez called John Decker to ask Decker to tell the defendant that he'd "like to receive [his] children."  John Decker testified that he called the defendant and "said, 'look, James [Hill-Hernandez] just left [the courthouse], he's got custody papers for the kids.'  And that was it.  [The defendant] hung up on me."

{¶ 8}   Also testifying on behalf of the state was the defendant's ex-wife (and mother of Jennifer), Shawna Haynes ("Shawna").  Shawna accompanied the defendant to the Fostoria Police Department on December 19, 2017, so that they could talk to the police "about [Jennifer's] death."  When the defendant left the station, he announced that he "had to leave [and] go get the kids from John and Mandy [Decker], [because] James [Hill-Hernandez] was on his way with a court order to get the boys."

4.

**{¶ 9}** Amanda Decker was caring for the two younger boys at her home, in Fostoria, when the defendant arrived. He told Amanda that "he was taking the boys," and she instructed them to "get their shoes and stuff." About 3:15 p.m., John Decker arrived home and helped the boys to get dressed. The defendant told the couple that "he didn't want James [Hill-Hernandez] to have [the children because] he didn't feel like [Hill-Hernandez] would take care of them." The defendant also said that "he was going to pick up [his oldest grandson]" from school but then "called his wife [Marcella] to have her [go] get [him]." The defendant told the Deckers that he intended to "get a lawyer and file paperwork" and that "he wasn't going to give the kids back," notwithstanding the temporary custody order. Neither Amanda nor John Decker tried to dissuade the defendant, despite Hill-Hernandez's request for help, because they "didn't want to get in the middle of it because [they] was friends with both [men.]" Amanda Decker added that it "wasn't [her] place to [say] 'no, you can't take them.'"

**{¶ 10}** At 3:14 p.m., Marcella Haynes picked up the oldest child from Longfellow Elementary School in Fostoria, according to the school's "sign-out sheet." The assistant secretary for the school testified that it was "very normal" for Marcella and the defendant to pick up and drop off J.H.-H. from school, and both were authorized to do so.

**{¶ 11}** Later that day, still December 19, 2017, a Rising Sun Police Officer escorted Hill-Hernandez to the defendant's home. Although no one answered the door, lights were on inside, and it appeared to Hill-Hernandez that someone was there.

5.

{¶ 12} The state presented extensive testimony as to Hill-Hernandez's efforts over the coming days to regain custody of his three children. Briefly, those efforts included:

**December 20, 2019**: Hill-Hernandez texted the defendant twice, and again, the defendant did not respond.

**December 21, 2019**: Hill-Hernandez contacted the Wood County Sheriff's Department. Sheriff's deputies and Rising Sun police officers went to the defendant's home. Again, the lights were one, but no one answered the door.

**December 22, 2017**: The police and Hill-Hernandez went to the defendant's home, to no avail. Also, Hill-Hernandez filed a petition for a writ of habeas corpus with the Seneca County Juvenile Court, alleging that his children were being held in contravention of the temporary custody order.

**December 23, 2017**: The police returned to the defendant's home a fourth time "to make contact with [the defendant] and secure the safe return of the children [and] [y]et again no one answered the officer's knocks." (State's memorandum at 11).

**December 26, 2017**: The police obtained and executed a search warrant of the defendant's home. No one was home at the time of search, and the officers gained entry by force. Using subpoenas to track the

6.

defendant's whereabouts, the police determined that the defendant was in McComb, Ohio in Hancock County.

**December 27, 2017**:  The juvenile court granted Hill-Hernandez's petition for a writ of habeas corpus and ordered that the children "shall be immediately returned to the Temporary Custody of James Hill-Hernandez." (Seneca Co. Court of Common Pleas case Nos. 21270037 et al).  Also that day, Detective-Sergeant Joe Miller of the Wood County Sheriff's Department went to the home of Connie and Leonard Spence in McComb.  Connie Spence told the detective that the defendant, Marcella and four children had been at their home for the Christmas holiday since December 22, 2017, but that they had "just left."  Detective Miller left the premises but returned later that day.  While talking to the Spences, Detective Miller observed a man exit the Spence's garage and get into a truck.  The detective blocked the truck with his own vehicle, and, after each had identified himself, the defendant claimed that the children were not there.  Ultimately, he admitted that they were inside the Spence's home, specifically in a "mother-in-law suite" attached to the garage.  Detective Miller contacted the Hancock County Sherriff's Department which processed the defendant's arrest.  After the defendant was taken into custody, the McComb Police Department and Detective Miller were granted entry into the Spence's home where the children were located.

{¶ 13} After learning that his children were in McComb, Hill-Hernandez "jumped" into his car and "got [his] boys back." Once reunited, he felt "relief" to know that they "were safe." Hill Hernandez testified that the defendant did not have permission to "take" the children and "keep them" as of December 19 through December 27, 2017.

{¶ 14} The defendant testified in his own defense, as did his wife, Marcella. Prior to his daughter's death, the defendant cared for his grandsons (and granddaughter, "M") in his home "every other weekend." After Jennifer died, there were "discussions" that he and Marcella would be "the main caretakers" of the children. According to the defendant, their house in Rising Sun would be the "home base," but they would "share the responsibility of watching the * * * three boys" with Hill-Hernandez.

{¶ 15} The defendant also testified about the disagreement between himself and Hill-Hernandez on December 18, 2017. According to the defendant, Hill-Hernandez arrived at his house with "drunken breath" and was acting "loud." The defendant thought Hill-Hernandez was going to "punch" him, and the defendant told him "you got to go, man." Hill-Hernandez told the defendant and Marcella, "'I don't think it's right. I don't have no right to my kids. * * * I found out I don't have no rights to them.'" Hill-Hernandez announced his intention to go "to the courts," and the defendant responded that he intended to do the same.

{¶ 16} By all accounts, Hill-Hernandez left the defendant's home that night, December 18, 2017, and his children remained in the care of the defendant.

{¶ 17} The next day, the day of the abductions, Marcella dropped off the older son at school, and the defendant took the two younger boys to the Deckers. After dropping off the children, the defendant picked up his ex-wife, Shawna Haynes, and drove to the courthouse in Tiffin to pick up "papers for emergency temporary custody" (which he prepared later from home). Next, they went to "the cop shop" to inquire about "about Jennifer['s]" death. From the police station, the defendant went to a "flea market" to attend to his business. The defendant denied that he was in a hurry to get to his grandsons. When he did arrive at the Deckers, he claims that the Deckers made disparaging remarks about his now-deceased daughter, which made him angry and upset. John Decker also said that Hill-Hernandez "'was over there filing for temporary custody,'" and the defendant responded he had just gone "over there and got[ten] the papers [to do] the same thing." When it was time to go, the defendant claimed that the two younger boys "ran" toward his truck and climbed inside on their own volition. The defendant buckled them into car seats and drove them "two blocks down the street" to Shawna's for a planned visit.

{¶ 18} The defendant agreed that John Decker called him, but he maintained that the call was made *after* he left the Decker's home and *after* he had dropped off the boys with his ex-wife. During their conversation, Decker told him that Hill-Hernandez had been granted temporary custody and that he, the defendant, should "bring the boys back." The defendant asked, rhetorically, why should he "believe anything" Decker had to say, and he demanded "an apology" for "desecrate[ing]" his daughter's name and "hung up."

9.

The defendant then picked up his school-aged grandson from Marcella and dropped him at his ex-wife's to join the younger boys. The defendant admitted that Hill-Hernandez "sent me some texts [but] he never opened [or] looked at them.

{¶ 19} The next day, on December 20, 2017, the defendant filed for temporary custody of his grand-daughter and 4 grandsons in Seneca County. On December 21, 2017, he learned—in person from court personnel—that the juvenile court granted the motion, with respect to his granddaughter "M," but denied it as to his grandsons. That same day, the defendant hired a lawyer and paid him a $2,000 retainer fee.

{¶ 20} According to the defendant, the children remained with his ex-wife Shawna from December 19 until 22, 2017, when he and Marcella took them (and "M") to the Spences' home in McComb for a "vacation." On December 27, 2017, the defendant learned in an email from this attorney of the "bad news" that "[t]he court want[ed] the children returned [to Hill-Hernandez] immediately." The defendant claimed that they were preparing to leave McComb to return the boys to their father when he was arrested in the Spence's driveway.

{¶ 21} The defendant was indicted in Wood County on February 8, 2018, on charges of abduction—two counts as to each grandson—for a total of six counts, all third degree felonies. Thus, as to each child, the defendant was indicted under R.C. 2905.02(A)(1) and (2). Before trial, the state voluntarily dismissed the counts brought under Section (A)(2), i.e. Counts 2, 4, and 6, leaving Counts 1, 3, and 5 under Section (A)(1) to be tried.

10.

{¶ 22} On January 25, 2019, the jury returned a guilty verdict as to each count. The defendant filed two post-trial motions: a motion to acquit on the basis that the state failed to present legally sufficient evidence of "force" and a motion to dismiss the indictment on the basis that the state should have, under R.C. 1.51, proceeded with the more specific offense of interference with custody, rather than abduction. The trial court denied the motions, which are the subjects of defendant's first and fourth assignments of error, respectively.

{¶ 23} On April 9, 2019, the trial court sentenced the defendant to one year of community control, as to each count. The defendant appealed and raises five assignments of error for review:

I. The prosecution failed to present sufficient evidence to sustain a conviction of Abduction under O.R.C. 2905.02(A)(1) contrary to the United States and Ohio Constitutions.

II. Ernie Haynes' right to a fair trial and Due Process under the Constitutions of the United States and Ohio were violated when the trial court overruled Haynes' objection to the prosecution misrepresenting the State's burden of proof in closing as to the element of privilege and permitted the prosecution to proceed to claim that the State needed only to prove that Mr. Haynes did not have any one type of privilege, rather than the plain language of the instruction that requires the defendant to be without privilege of any type.

11.

III. The trial court erred and Mr. Haynes' right to a fair trial and due process were violated when it failed to order the prosecution to furnish a meaningful Bill of Particulars upon Haynes' motion to compel which allowed the prosecution to finally reveal the alleged time and place of the accused behavior in the prosecution's closing argument.

IV. The trial court should have dismissed the indictments based upon Haynes' post-conviction motion to dismiss because Interference with Custody was the more specific charge, and the state was required to pursue that charge.

V. Ernie Haynes' convictions are against the manifest weight of the evidence.

**The state presented legally sufficient evidence of force.**

{¶ 24} In his first assignment of error, the defendant argues that the state failed to present legally sufficient evidence to support his abduction convictions.

{¶ 25} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or

assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 26} The abduction statute, R.C. 2905.02, provides, in relevant part, that,

(A) No person, without privilege to do so, shall knowingly do any of the following:

(1) By force or threat, remove another from the place where the other person is found;

(2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear; * * *

(C) Whoever violates this section is guilty of abduction. A violation of division (A)(1) or (2) of this section * * * is a felony of the third degree. * * *.

{¶ 27} As discussed, Haynes was convicted of three counts under subsection (A)(1); the charges under subjection (A)(2) were voluntarily dismissed.

{¶ 28} On appeal, the defendant claims that the state failed to present legally sufficient evidence that he abducted the children by "force or threat." The term "force" is expressly defined by statute. It "means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). In *State v. Heiney*, 6th Dist. Lucas No. L-16-1042, 2018-Ohio-3408, we discussed the components of "force" and their respective definitions:

13.

"Any," as used in R.C. 2901.01(A)(1), is an adjective. "'As an adjective, 'any' is defined as: '[o]ne or some, regardless of kind, quantity, or number; an indeterminate number or amount.'" *State v. Euton*, 3d Dist. Auglaize No. 2-06-35, 2007-Ohio-6704, 2007 WL 4374293, ¶ 60, quoting The American Heritage Dictionary (2nd College Ed.1985) 117. "[T]he insertion of the word 'any' into the definition of 'force,' recognizes that different degrees and manners of force are used in various crimes with various victims." *State v. Lillard*, 8th Dist. Cuyahoga No. 69242, 1996 WL 273781, *6, (May 23, 1996).

"Violence" is defined, in part, as "[t]he use of physical force" or "[p]hysical force exerted for the purpose of violating, damaging, or abusing." *State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, quoting *Black's Law Dictionary* 1801 (14th Ed.2014) and *The American Heritage Dictionary* at 1350.

"Compulsion" means "[t]he act of compelling; the quality, state, or condition of being compelled." *Stevens* at ¶ 19, quoting *Black's* at 348. "Compulsion can take other forms than physical force; but in whatever form it appears* * * [i]t can best be considered under the heads of obedience to orders, material coercion, duress per minas, and necessity." *Id.,* quoting Turner, *Kenny's Outlines of Criminal Law* 54 (16th Ed.1952).

14.

"Constraint" means "state of being checked, restricted, or compelled to avoid or perform some action." *Merriam Webster's Collegiate Dictionary* 248 (10th Ed.1996).

*Heiney* at ¶ 98-101. Also, although the synonyms that the legislature chose to define the term force—violence, compulsion and constaint—are "ordinarily applicable to persons rather than things," the definition applies "both to persons and things." *State v. Lane,* 50 Ohio App.2d 41, 46, 361 N.E.2d 535 (10th Dist.1976).

{¶ 29} At trial, the state presented its case of "force" as follows:

In this particular case the force that was used was physically removing the children and driving away. Those children were put in child restraint seats. * * * But reason and common sense says but for what Marcella and the defendant did, those children would have remained where they were at. [The oldest child] would have remained at the elementary school until somebody else came to pick him up, and [the younger two] would have remained at the Deckers.

{¶ 30} In his brief, the defendant challenges the prosecution's "theory" that it "need only show that 'any' amount of force was used." Without citing any authority, he claims there is "no question" that the state must present "more than" the "ordinary force involved in picking up children from school or a baby-sitter."

{¶ 31} Force is expressly defined as "*any* violence, compulsion, or constraint * * *." (Emphasis added.) And, "a court cannot simply ignore or add words" to an

15.

unambiguous statute. *Portage Cty. Bd. Of Commissioners v. Akron,* 109 Ohio St.3d 106, 200-Ohio-954, 846 N.E.2d 478. As we remarked in *Heiney*, the use of the word "any" to describe "force" recognizes that different degrees and manners of force are used in various crimes with various victims.

{¶ 32} For example, in *Lane*—an aggravated burglary case requiring the state to show a trespass "by, force, stealth, or deception"— the issue was whether the trial court erred by using the word "effort" rather than "violence, compulsion, or constraint" in its charge to the jury. The court found no "substantial difference between the statutory definition [of force] and that given by the trial court," and it reasoned that "the statute clearly indicates that 'compulsion * * * physically exerted' against a thing to gain entrance constitutes force. The same is true of constraint. The 'thing' in this case is a closed but locked door." *Id.* at 46.

{¶ 33} In a similar case, also involving burglary, the Second Appellate District added that the definition of force "does not provide for any measure of the physical exertion that might constitute force, but instead looks to the purpose for which the physical exertion, however slight, has been employed. If the purpose is to overcome a barrier against the actor's conduct, whether that barrier is the will of the victim or the closed but unlocked door of a home, the physical exertion employed to overcome the barrier may constitute force." *State v. Gregg,* 2d Dist. Champaign No. 91-CA-15, 1992 WL 302438 (Oct. 26, 1992) (Finding sufficient evidence that defendant used force when he "turned the knob and opened the closed door to enter [the home]; A greater degree of

physical exertion, including violence, is not necessary to satisfy the [force element."). *See also State v. Johnson,* 8th Dist. Cuyahoga Nos. 81692, 81692, 2003-Ohio-3241, ¶ 67-68 ("'[F]orce' * * * simply requires [that] effort be exerted against a person or thing.").

{¶ 34} Just as the trespass-by-force element was met in the burglary cases by demonstrating compulsion physically exerted against a thing (i.e. a door), we find that the removal-by-force element in this case was shown by demonstrating compulsion physically exerted against things. Those "things" were the controls of the defendant's truck and Marcella's car. We agree with the state that the physical act of driving the children away from the place where they were found satisfies the force element in this case. The law is clear that *any* amount of force or threat of force, however slight, against a thing, here the motor vehicles, is sufficient to support an abduction conviction.

{¶ 35} Next, the defendant argues that the state failed to show that he removed the children under "circumstances which pose[d] a risk of harm to [them] or place[d] [them] in fear." (Brief at 8 quoting Legislative Service Commission, 1973). He argues that the only evidence at trial established that the children left with their grandparents "willingly" and in the presence of other adults, who were "not alarmed." But, under Section (A)(1), the state was not required to present evidence that the removal occurred under circumstances that created a risk of physical harm to the victims or that the victims were placed in fear. Such a showing *is* required under Section (A)(2), and those counts were dismissed before trial. Moreover, to the extent that the children's willingness to leave with their grandparents raises the issue of whether the defendant was "privileged" to

17.

remove them, we note that the defendant has not challenged the sufficiency of the state's evidence as to that element of the offense.

{¶ 36} Finally, the defendant argues that the act of "buckling" the children into child safety seats cannot establish "the sole basis" of the force element because he was required by law to use child safety seats when transporting the children. *See* R.C. 4511.81 ("Certain children to be secured in child restraint system").

{¶ 37} As we have found, the act of driving the children from the place where they were found established force in this case, and that finding is without regard to whether the children were first fastened into child safety seats. But, it is also true that the state created confusion by stressing the fact that the children were buckled into car seats before the defendant and Marcella drove away.

{¶ 38} First, it bears repeating that the state abandoned its abduction cases under Section (A)(2) which would have required it to show the defendant "restrain[ed] the liberty" of the children. Second, to the extent that the defendant was prevented from asserting R.C. 4511.81 as a defense, as he claims in his brief—because he was not told until trial that the state would identify the use of car seats as evidence of force—we find no reversible error. An appellate court cannot reverse a lower court decision that is legally correct even if it is a result of erroneous reasoning. *City of Toledo v. Schmiedebusch*, 192 Ohio App.3d 402, 2011-Ohio-284, 949 N.E.2d 504, ¶ 37 (6th Dist). That is, this court will not reverse a trial court decision that "achieves the right result for the wrong reason, because such an error is not prejudicial." *Id.* Here, the state presented

18.

legally sufficient evidence of force irrespective of whether the children were buckled in child safety seats, and the state's reliance on them, if any, to show force is not grounds for reversal.

{¶ 39} In examining a challenge to the sufficiency of the evidence, we must consider the evidence in the light most favorable to the prosecution and determine whether a rational juror could have found the essential elements of the crime proven beyond a reasonable doubt. *Jenks* at paragraph two the syllabus. The testimony presented at trial, if believed, established that the defendant, personally and in complicity with Marcella, removed the children by force from the place where they were found. We find that the state presented legally sufficient evidence of "force" in this case. Accordingly, the defendant's first assignment of error is found not well-taken.

**The trial court did not err in overruling the defendant's objection during the state's closing argument as to the element of "privilege."**

{¶ 40} The test for prosecutorial misconduct in closing arguments "is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Ndiaye*, 10th Dist. Franklin No. 13AP-964, 2014-Ohio-3206, ¶ 14, quoting *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.883 (1984). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." (Internal quotation omitted.) *Id.,* quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.E.2d 78 (1982). Thus, prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial. *Id.,* citing *State v. Mauer,* 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

19.

{¶ 41} In his second assignment of error, the defendant alleges that the trial court erred in overruling his objection to the "prosecution misrepresenting the State's burden of proof" as to the element of privilege.

{¶ 42} To convict the defendant of abduction, "the finder of fact must [have] determine[d] that the defendant removed * * * the victim[s] by force or threat 'without privilege to do so.'" *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26, quoting R.C. 2905.02(A). "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).

{¶ 43} During closing arguments, the prosecutor said,

> Now, with respect to privilege, I'm going to visit or revisit eighth grade grammar class. I've put the definition of privilege up on the screen. * * * It says privilege means an immunity, license or right conferred by law, or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity. The only thing that matters here is the State has to prove [the defendant] didn't have one of those. It's written in the disjunctive. (Emphasis added.) Tr. at 839-840.

{¶ 44} The defendant objected, and the trial court overruled the objection. On appeal, the defendant argues that the prosecutor led the jury to believe, incorrectly, that the state only had to prove that the defendant did not have *one* of those—an immunity, license or right—to satisfy its burden of proof as to privilege. And, he maintains that,

20.

because the error went uncorrected, there is "uncertainty" as to whether "the jury actually found [the privilege] element beyond a reasonable doubt."

{¶ 45} Terms that are undefined in a statute are accorded their common, everyday meaning. S*atterfield v. Ameritech Mobile Communications, Inc*., 155 Ohio St.3d 463, 2018-Ohio-5023, 122 N.E.3d 144. Because the state was required to show that the defendant acted "without privilege," it was required to show that he acted without an "immunity, license, *or* right." In other words, it had to show that *none* of those applied. Blacks Law Dictionary (6th Ed. 1991) ("In some usages, the word 'or' creates a multiple rather than an alternative obligation; where necessary * * * 'or' may be construed to mean 'and.'"). While we agree that the state's comment was erroneous, we also find that it not deprive the defendant of a fair trial. First, the prosecutor cured its misstatement when he asserted, correctly, that it was the state's burden to show "beyond a reasonable doubt that the defendant did not have a privilege to do what he did," and the prosecutor then quoted the statutory definition of privilege, verbatim. Second, the trial court also provided accurate instructions on all of the elements of the offense, including privilege, and it further instructed the jury that closing arguments are not to be considered evidence. *Accord, State v. Freeman,* 8th Dist. Cuyahoga No. 91842, 2009-Ohio-5218, ¶ 16-21. Finally, the fact that the defendant is not challenging that the state presented legally sufficient that he acted without privilege militates against a finding that the misstatement prejudiced the outcome of this case. For these reasons, we find that the trial court did not

err in overruling the defendant's objection. Therefore, his second assignment of error is not well-taken. .

### The trial court did not err in failing to compel the state to produce a bill of particulars.

{¶ 46} In his third assignment of error, the defendant argues that his right to a fair trial was violated when the trial court failed to order the state to furnish a meaningful bill of particulars, in contravention of Crim.R. 7(E).

{¶ 47} When the defendant makes a written request, "the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charged and of the conduct of the defendant alleged to constitute the offense." Crim.R. 7(E). "A bill of particulars has a limited purpose - to elucidate or particularize the conduct of the accused alleged to constitute the charged offense." *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985) .

{¶ 48} The defendant complains that, in response to his motion, the state provided a "copy of the indictment and referred to the discovery in this case." In denying the defendant's subsequent motion to compel, the trial court found that, "[t]he State of Ohio has a practice of providing open-file discovery" and "'[n]o bill of particulars is required when the state allows open-file discovery.'" *See* Aug. 15, 2018 Order, quoting *State v. Coffey,* 6th Dist. Lucas No. L-12-1047, 2013-Ohio-3555, ¶ 35. The defendant argues that *Coffey* is inapplicable because it involved an amendment to a bill of particulars, unlike this case which involves the absence of any bill. However, *Coffey* was not restricted to its facts. And, in any event, this precise issue was recently addressed in *State v. Franklin,*

22.

5th Dist. Muskingum No. CT2019-0042, 2020-Ohio-1263, ¶ 63-71, where the defendant filed a motion to compel a bill of particulars that included "the dates and times or the specific manner" of the offenses. On appeal, the court upheld the denial of the motion to compel, finding that "it is undisputed that the [county prosecutor's office] maintains 'open-file discovery,' pursuant to which the state provides discovery by allowing defense counsel to see all of its files regarding a case without requiring the defense to make a written request for discovery. No bill of particulars is required when the state allows open-file discovery." *Id. ¶* 69.

{¶ 49} Likewise, the defendant in this case sought "the exact time that the offense(s) allegedly took place." It is undisputed that the state provided open file discovery, which according to it, included "a written statement by John Decker indicating [that the defendant] had come over to his home [and] had picked up two of the three children." The discovery file also included police reports, medical reports, and witness statements in the case. Thus, as in *Coffey* and *Franklin*, a bill of particulars would not have provided the defense with any additional information. Accordingly, under the facts of this case, we find that the purpose of the bill of particulars was fulfilled. Accordingly, the defendant's third assignment of error is found not well-taken.

## The trial court did not err in denying the defendant's post-trial motion to dismiss.

{¶ 50} In his fourth assignment of error, the defendant argues that the trial court erred in failing to grant his post-trial motion to dismiss the indictment under R.C. 1.51.

23.

{¶ 51} R.C. 1.51 provides that, "[i]f a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." The statute "comes into play only when a general and a special provision constitute allied offenses of similar import and additionally do not constitute crimes committed separately or with a separate animus for each crime." *State v. Chippendale,* 52 Ohio St.3d 118, 120, 556 N.E.2d 1134 (1990). But, "when the offenses in question are not allied offenses of similar import, R.C. 1.51 does not preclude the offender from being charged with and convicted of both." *State v. Rivarde*, 197 Ohio App.3d 99, 2011-Ohio-5354, 966 N.E.2d 301 (12th Dist.), ¶ 11, quoting *State v. Smith,* 4th Dist. Meigs No. 09CA16, 2011-Ohio-965, ¶ 16.

{¶ 52} In his brief, the defendant baldly asserts that the state was "required to pursue" interference with custody charges against the defendant—rather than abduction—"because" the former is the "more specific charge." The defendant's claim is wholly unsupported with any legal arguments. Indeed, the defendant failed even to identify the interference statute by number or set forth its elements, much less analyze those elements so as to establish that it is an allied offense of abduction. As noted by the state, the defendant also failed to cite any case law in support of his proposition.

{¶ 53} This court is "not obligated to search the record or formulate legal arguments on behalf of the parties, because 'appellate courts do not sit as self-directed

24.

boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them.'" (Other internal quotation omitted.) *Risner v. Ohio Dep't of Nat. Res., Ohio Div. of Wildlife*, 144 Ohio St. 3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 28, quoting *State v. Quarterman,* 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19. We find the defendant's argument—that the trial court erred in denying his post-trial motion to dismiss the indictment—not well-taken. The defendant's fourth assignment of error is found not well-taken.

**The conviction was not against the manifest weight of the evidence**.

{¶ 54} In his fifth and final assignment of error, the defendant argues that his conviction was against the manifest weight of the evidence.

{¶ 55} Under a manifest weight standard, an appellate court must sit as a "thirteenth juror" and may disagree with the fact-finder's resolution of the conflicting testimony. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. The appellate court, "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" *Id.,* quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

25.

{¶ 56} The defendant complains that this case "revolved around the service, or lack thereof, of a temporary custody order [in Hill-Hernandez's favor], the violation of which could not result in an abduction charge." We disagree. The jury need not have concluded that the defendant had direct knowledge of the custody order in order to convict him. There was plenty of other evidence in the record to support the conclusion that the defendant knew, when he removed the children on December 19, 2018, that he did so without the consent of the children's father. That evidence included testimony that the defendant raced out of the police station to get to the children before Hill-Herndandez did, that he directed Marcella to pick up the school-aged boy before the end of the school day, that John Decker told the defendant that Hill-Hernandez "got custody for the kids," and, notwithstanding that, the defendant "wasn't going to give the kids back." Moreover, the defendant's failure to provide any credible explanation for not communicating with Hill-Hernandez over the next twelve days certainly supported the state's argument that he was, in fact, "on the lam."

{¶ 57} Finally, the defendant complains that his civil attorney "pick[ed] fights with the police detectives * * * for no apparent reason." Defendant's complaint, even if true, does not cast doubt on the weight of the evidence. Further, he bears at least some of the responsibility for his lawyer's bravado, given that the defendant failed to tell him a critical fact at the time he was retained, namely that the juvenile court had already granted Hill-Herndandez temporary custody.

26.

{¶ 58} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Jackson*, 2d Dist. Greene No. 2018-CA-37, 2019-Ohio-2130, ¶ 24. Based on this evidence, it cannot be said that the jury clearly lost its way and created a manifest miscarriage of justice. Based upon the evidence presented in this case, we cannot say that the verdict was against the manifest weight of the evidence. Therefore, the defendant's fifth assignment of error is not well-taken.

## Conclusion

{¶ 59} As set forth herein, the defendant's assignments of error are found not well-taken. Accordingly, the April 9, 2019 judgment of the Wood County Court of Common Pleas is affirmed, with costs ordered to be paid by the defendant pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.              _____

                                                      JUDGE

Christine E. Mayle, J.          

                                             _____

Gene A. Zmuda, P.J.                                          JUDGE
CONCUR.

                                             _____

                                                      JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.